# Illinois Official Reports

## Appellate Court

---

**Lindorff v. Department of Central Management Services/The Department of Corrections, 2015 IL App (4th) 131025**

---

| | |
|---|---|
| Appellate Court Caption | LOIS LINDORFF and DEBORAH FUQUA, Petitioners, and THE AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, Realigned Petitioner, v. THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES/THE DEPARMENT OF CORRECTIONS; THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; and MARY L. MILLER, Respondents. |
| District & No. | Fourth District Docket No. 4-13-1025 |
| Filed | July 7, 2015 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-DE-14-055. |
| Judgment | Affirmed. |
| Counsel on Appeal | James P. Baker (argued), of Baker, Baker & Krajewski, LLC, of Springfield, for petitioners Lois Lindorff and Deborah Fuqua. |
| | Gail E. Mrozowski (argued) and Mark S. Stein, both of Cornfield & Feldman, of Chicago, for realigned petitioner. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Timothy M. Maggio and Sharon A. Purcell (argued), Assistant Attorneys General, of counsel), for respondents. |

| Panel | JUSTICE TURNER delivered the judgment of the court, with opinion. Presiding Justice Pope and Justice Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1 Pursuant to Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994) and section 11(e) of the Illinois Public Labor Relations Act (Labor Act) (5 ILCS 315/11(e) (West 2012)), petitioners, Lois Lindorff and Deborah Fuqua, seek direct review of a decision of respondent, the Illinois Labor Relations Board, State Panel (Board), finding their positions qualified for a gubernatorial designation for exclusion from collective bargaining under section 6.1(b)(5) of the Labor Act (5 ILCS 315/6.1(b)(5) (West Supp. 2013)). With this court, the American Federation of State, County, and Municipal Employees, Council 31 (AFSCME), filed a written appearance and a brief in support of petitioners' position, and thus we realigned AFSCME as a petitioner. Respondents, the Board and the Department of Central Management Services (CMS)/Department of Corrections (DOC), filed a joint brief. Respondent, Mary L. Miller, was the other employee in a position subject to the Board's order, but she did not enter a written appearance with this court.

¶ 2 On review, petitioners (1) challenge the Board's interpretation of section 6.1(c)(i) of the Labor Act (5 ILCS 315/6.1(c)(i) (West Supp. 2013)) and (2) argue the health-care-unit-administrator position did not meet the requirements for a gubernatorial designation under section 6.1(b)(5) of the Labor Act. We affirm.

¶ 3                                I. BACKGROUND

¶ 4 On August 20, 2013, CMS filed a gubernatorial designation of exclusion petition under section 6.1 of the Labor Act, seeking to exclude from collective bargaining three health care unit administrators (two were public service administrators option 8N and one was public service administrator option 6) in the DOC. The petition asserted the positions met the requirements of section 6.1(b)(5) of the Labor Act (5 ILCS 315/6.1(b)(5) (West Supp. 2013)). On August 30, 2013, petitioners and Miller filed separate objections to the petition, each asserting her position did not qualify for a gubernatorial designation because it did not meet the requirements of section 6.1(b)(5) of the Labor Act. On September 6, 2013, AFSCME filed its objections to the gubernatorial designation of the positions at issue.

¶ 5 On September 12, 2013, the administrative law judge (ALJ) held an evidentiary hearing in accordance with section 1300.60(d)(2)(B) of Title 80 of the Illinois Administrative Code (80 Ill. Adm. Code 1300.60(d)(2)(B) (2013)). The evidence established the structure of medical services within the DOC. At the correctional centers at issue in this case, the vendor, Wexford Health Sources, Inc. (Wexford), provided all of the medical care for the inmates. Wexford employed all of the health care workers, including a medical director and director of nursing for each correctional center. DOC also employed a medical director, who at the relevant time was Dr. Louis Shicker. The DOC medical director oversaw all of the health care services for the entire inmate population in Illinois and was assisted by nurse coordinators. Each correctional center was run by a warden, who had two assistant wardens, one for programs and

one for operations. The health care unit was the largest program under the assistant warden for programs. The health care unit administrator was the employee under the assistant warden for programs, who primarily monitored Wexford's compliance with the state and federal laws and regulations, DOC administrative and institutional directives, and Wexford's contract with the DOC.

¶ 6 The administrative directives for health care were created by the DOC medical director. A correctional center could only deviate from an administrative directive by adopting an institutional directive that was more stringent than the applicable administrative directive. The health care unit administrators at issue in this case were registered nurses.

¶ 7 Fuqua testified every aspect of the operation of her health care unit was governed by federal and state laws and administrative and institutional directives. She had no authority to deviate from the directives and had no role in the promulgation of both administrative and institutional directives. If she thought a directive needed to be changed, Fuqua would notify her supervisor. Each month, Fuqua completed a report that measured Wexford's performance. The report had six pages of instructions, of which the health care unit administrator had no role in writing. According to Fuqua, if she discovered any noncompliance, she had to report it. The discretionary language in the report's instructions was for the business administrators, not the health care unit administrators. She had no role in any sanctions that could result from noncompliance. Fuqua further testified the health care unit had a mission statement, and she had no role in its creation. She also had no role in formulating a budget.

¶ 8 Fuqua also attended many monthly meetings. One was with the warden, during which he updated all of the department heads on new administrative and institutional directives and staff appointments. It was the health care unit administrator's responsibility to cover the new directives at a monthly staff meeting with Wexford employees. The assistant warden of programs also held a monthly meeting for department heads that covered similar topics. Additionally, Fuqua met with the assistant warden of programs on a daily basis to report any violations by Wexford. Health care unit administrators also had a quality improvement meeting with a representative from Dr. Shicker's office, in which they discussed the parts of the contract not being met. Last, Fuqua explained the job description for health care unit administrators contained a lot of incorrect information.

¶ 9 Miller and Lindorff testified their correctional centers ran the same way as Fuqua's did. However, Lindorff estimated her time spent on monitoring Wexford was 70-80%.

¶ 10 Dr. Shicker testified the health care unit administrators had discretion in reporting deviations because only significant deviations needed to be reported. He explained missing one offender's physical by the set date was insignificant, but a pattern of missing physicals would be significant. Dr. Shicker also explained that, in reporting staff shortages, the health care unit administrator had to weigh whether the services required by the contract were being done versus the specific employee that had to fill the hours. Beyond the two aforementioned areas of the report, the health care unit administrator had very little discretion with the rest of the report.

¶ 11 Forrest Ashby was the assistant warden of programs at Western Correctional Center, and he testified his health care unit administrator was considered a department head and part of his management team. He communicated with his health care unit administrator daily and relied on the health care unit administrator and his Wexford director of nursing to make decisions regarding medical matters, as he was not a nurse. If a decision was made Wexford had to pay

back hours not worked under the contract, Fuqua, his health care unit administrator, would be the one to notify Wexford. Ashby also noted the health care unit administrator attended confidential meetings.

¶ 12    On September 23, 2013, the ALJ issued a recommended decision and order, finding the gubernatorial designations were properly made. Petitioners, Miller, and AFSCME filed objections to the ALJ's recommended decision and order. On October 21, 2013, the Board accepted the ALJ's decision and certified the gubernatorial designation of the three health-care-unit-administrator positions.

¶ 13    On November 20, 2013, petitioners timely filed their petition for direct administrative review in this court. In January 2015, this court discovered Miller, who was a party before the Board, was not named as a respondent in petitioners' petition. Thus, under section 3-113(b) of the Administrative Review Law (735 ILCS 5/3-113(b) (West 2012)), we gave petitioners 35 days to name and serve Miller as a respondent. On February 9, 2015, petitioners filed an amended petition for direct administrative review, naming Miller. As stated, Miller did not enter her written appearance as a party to this appeal. Accordingly, we have jurisdiction under Rule 335.

¶ 14                                II. ANALYSIS
¶ 15                              A. Standard of Review

¶ 16    With direct administrative review, this court reviews *de novo* the agency's decision on a question of law. *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 379 Ill. App. 3d 22, 26, 883 N.E.2d 29, 33 (2007). On the other hand, we afford deference to the agency's decision on a question of fact and will not reverse such a decision unless it is against the manifest weight of the evidence. *Niles Township*, 379 Ill. App. 3d at 26, 883 N.E.2d at 33. An administrative agency's finding is "against the manifest weight of the evidence only where the opposite conclusion is clearly evident." *Peacock v. Board of Trustees of the Police Pension Fund*, 395 Ill. App. 3d 644, 652, 918 N.E.2d 243, 250 (2009).

¶ 17    Some agency decisions involve both questions of law and fact. " 'A mixed question of law and fact asks the legal effect of a given set of facts.' " *Niles Township*, 379 Ill. App. 3d at 26, 883 N.E.2d at 33 (quoting *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143, 849 N.E.2d 349, 358 (2006)). This court will not reverse an agency's decision on a mixed question of law and fact unless it is clearly erroneous. *Niles Township*, 379 Ill. App. 3d at 26, 883 N.E.2d at 33. Our supreme court has defined the clearly erroneous standard as follows:

> "An agency decision will be reversed because it is clearly erroneous only if the reviewing court, based on the entirety of the record, is left with the definite and firm conviction that a mistake has been committed. [Citation.] While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order." (Internal quotation marks omitted.) *SPEED District 802 v. Warning*, 242 Ill. 2d 92, 112, 950 N.E.2d 1069, 1080-81 (2011) (quoting *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97-98, 862 N.E.2d 944, 950-51 (2007)).

¶ 18                              B. Gubernatorial Designation

¶ 19        This case involves a relatively new statute, which took effect in April 2013. Section 6.1(a) of the Labor Act (5 ILCS 315/6.1(a) (West Supp. 2013)) authorizes the Governor "to designate up to 3,580 State employment positions collectively within State agencies directly responsible to the Governor, and, upon designation, those positions and employees in those positions, if any, are hereby excluded from the self-organization and collective bargaining provisions of Section 6 of this Act." To qualify for a designation under section 6.1(a), the employment position must meet one or more of five enumerated requirements, and the one at issue in this case is the position "must authorize an employee in that position to have significant and independent discretionary authority as an employee." 5 ILCS 315/6.1(b)(5) (West Supp. 2013). Section 6.1(c) of the Labor Act (5 ILCS 315/6.1(c) (West Supp. 2013)) defines "significant and independent discretionary authority" and provides an employee has such under the following circumstances:

> "if he or she (i) is engaged in executive and management functions of a State agency and charged with the effectuation of management policies and practices of a State agency or represents management interests by taking or recommending discretionary actions that effectively control or implement the policy of a State agency or (ii) qualifies as a supervisor of a State agency as that term is defined under Section 152 of the National Labor Relations Act or any orders of the National Labor Relations Board interpreting that provision or decisions of courts reviewing decisions of the National Labor Relations Board."

Additionally, "[a]ny designation made by the Governor under this Section shall be presumed to have been properly made." 5 ILCS 315/6.1(d) (West Supp. 2013).

¶ 20        In this case, the parties agree petitioners are not supervisors under section 6.1(c)(ii) of the Labor Act. Thus, we turn to section 6.1(c)(i) of the Labor Act (5 ILCS 315/6.1(c)(i) (West Supp. 2013)), which contains two different ways in which an employee is authorized to exercise "significant and independent discretionary authority." See 5 ILCS 315/6.1(c)(i) (West Supp. 2013). The parties appear to be in dispute over how the two different ways are defined, which presents a matter of statutory interpretation.

¶ 21        The fundamental rule of statutory construction requires courts to ascertain and give effect to the legislature's intent. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 180, 950 N.E.2d 1136, 1146 (2011). The statutory language, given its plain and ordinary meaning, best indicates the legislature's intent. *Pappas*, 242 Ill. 2d at 180, 950 N.E.2d at 1146. In interpreting a statutory provision, courts evaluate the statute as a whole, "with each provision construed in connection with every other section." *Pappas*, 242 Ill. 2d at 180, 950 N.E.2d at 1146. When the statutory language is clear and unambiguous, a court must give effect to the statute's plain meaning without resorting to extrinsic statutory-construction aids. *Pappas*, 242 Ill. 2d at 180, 950 N.E.2d at 1146.

¶ 22        The dispute between the parties in interpreting section 6.1(c)(i) arises due to the two conjunctions in that provision. Petitioners assert an employee must be "engaged in executive and management functions of a State agency" and meet one of the phrases joined by the "or." The Board appears to interpret the section as all of the language preceding the "or" is one way to the meet the definition, and the language after the "or" is the second way. We agree with the Board and note the language is not ambiguous, so we have not looked to legislative history in reaching our conclusion. Under the plain language of section 6.1(c)(i) and by properly keeping

the verbs in tense agreement in respect to the conjunctions, an employee meets the definition of section 6.1(b)(5) in the following two situations: (1) the employee "is [(a)] engaged in executive and management functions of a State agency *and* [(b)] charged with the effectuation of management policies and practices of a State agency" *or* (2) the employee "represents management interests by taking or recommending discretionary actions that effectively control or implement the policy of a State agency." (Emphasis added.) 5 ILCS 315/6.1(c)(i) (West Supp. 2013). Moreover, unlike petitioners' interpretation, our interpretation does not render any language superfluous. If an employee is already engaged in executive and management functions, the employee would already be representing management interests. We will refer to the first test set forth in section 6.1(c)(i) as managerial authority and the second as management representation.

¶ 23                                  1. *Managerial Authority*

¶ 24        Petitioners assert we should interpret the managerial authority definition of section 6.1(c)(i) the same as section 3(j) of the Labor Act (5 ILCS 315/3(j) (West Supp. 2013)). Section 3(j) provides, in pertinent part, the following: " 'Managerial employee' means an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West Supp. 2013). While the Board's decision agreed with the contention the managerial authority language of section 6.1(c)(i) tracks the language of section 3(j), it found the managerial-authority provision did not have the same meaning because (1) that provision lacked the "predominantly" language contained in section 3(j) and (2) the existence of the presumption the designation was proper under section 6.1(d). We note the Board examined and the parties on appeal all looked to cases interpreting section 3(j) in defining the managerial-authority test, and thus we will begin our analysis there.

¶ 25        While section 6.1(c)(i) and the other provisions of the Labor Act do not define "executive and management functions," this court has generally interpreted that language to mean duties related to the running of a department, for example, by "formulating policies and procedures." *Department of Central Management Services/Pollution Control Board v. Illinois Labor Relations Board, State Panel*, 2013 IL App (4th) 110877, ¶ 25, 982 N.E.2d 971 (hereinafter *Pollution Control Board*). Illinois courts have found other duties include preparing the budget or assuring the agency or department operates effectively. *American Federation of State, County & Municipal Employees (AFSCME), Council 31 v. Illinois Labor Relations Board, State Panel*, 2014 IL App (1st) 123426, ¶ 38, 17 N.E.3d 698. Additionally, " '[t]he employee must possess and exercise authority and discretion which broadly effects a department's goals and means of achieving its goals.' " *AFSCME*, 2014 IL App (1st) 123426, ¶ 38, 17 N.E.3d 698 (quoting *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 87, 662 N.E.2d 131, 136 (1996)). We find these cases would also apply under the first part of section 6.1(c)(i). However, section 6.1(c)(i) does lack the "predominantly" language, which narrows section 3(j)'s definition of "managerial employee." See *County of Cook v. Illinois Labor Relations Board–Local Panel*, 351 Ill. App. 3d 379, 387 n.1, 813 N.E.2d 1107, 1115 n.1 (2004). "Predominantly" generally means: "for the most part: MAINLY." Merriam-Webster's Collegiate Dictionary 916 (10th ed. 2000). Thus, unlike section 3(j), the "executive and management functions" do not have to comprise most of the employee's work for the employee to meet the first part of the managerial-authority test.

¶ 26　　As to section 3(j)'s language that is similar to the second part of the managerial-authority test, this court has found the employee must not merely have the "authority to make policy but also bear[ ] the responsibility of making that policy happen." (Internal quotation marks omitted.) *Pollution Control Board*, 2013 IL App (4th) 110877, ¶ 26, 982 N.E.2d 971 (quoting *Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, 2011 IL App (4th) 090966, ¶ 135, 959 N.E.2d 114). However, we find our case law regarding section 3(j) inapplicable to this part of the managerial-authority test contained in section 6.1(c)(i) because that section lacks "the responsibility of directing" language contained in section 3(j). Thus, under the second part of the managerial-authority test, the employee would just need to effectuate management policies and practices. For purposes of the managerial-authority test, effectuate means "to put into operation." Merriam-Webster's Collegiate Dictionary 367 (10th ed. 2000) (we note the definition of "effectuate" refers to the second definition of "effect," and the quoted language comes from part 2b of the second definition of "effect").

¶ 27　　　　　　　　　　　　*2. Management Representation*

¶ 28　　Both petitioners and the Board note the language of the management-representation part of section 6.1(c)(i) is the same language used by the United States Supreme Court in *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672, 683 (1980). Our supreme court applied the reasoning in *Yeshiva* for determining a managerial employee under the Labor Act in *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 339-41, 687 N.E.2d 795, 797-98 (1997) (hereinafter *Chief Judge*). There, our supreme court recognized that, "[i]n applying the managerial exclusion to the Yeshiva faculty, the Court stated that the Yeshiva faculty was intimately involved in policy decisions in a number of areas, including course offerings, course scheduling, teaching methods, grading policies, admissions standards, graduation standards, size of the student body, tuition, and location of a school." *Chief Judge*, 178 Ill. 2d at 340, 687 N.E.2d at 798 (citing *Yeshiva*, 444 U.S. at 686). "[G]iven the concern for divided loyalty between employer and union, 'the relevant consideration is effective recommendation or control rather than final authority' over employer policy." *Chief Judge*, 178 Ill. 2d at 339-40, 687 N.E.2d at 798 (quoting *Yeshiva*, 444 U.S. at 683 n.17). However, the *Yeshiva* decision "did not intend to prevent all professionals from engaging in collective bargaining." *Chief Judge*, 178 Ill. 2d at 341, 687 N.E.2d at 798. "[E]mployees who only engage in 'the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty.' " *Chief Judge*, 178 Ill. 2d at 341, 687 N.E.2d at 798 (quoting *Yeshiva*, 444 U.S. at 690). We disagree with AFSCME's assertion that application of the aforementioned interpretation of the management-representation test results in the Governor being able to designate any professional employee as being excluded from collective bargaining under section 6.1(b)(5). Since the management-representation language of section 6.1(c)(i) is the same as the Supreme Court's in *Yeshiva*, we find the analysis of *Yeshiva* by our supreme court in *Chief Judge* also applies to the management-representation test of section 6.1(c)(i) of the Labor Act.

¶ 29                          C. The Positions at Issue

¶ 30        In this case, the Board found the positions at issue met the tests for both managerial authority and management representation. Generally, Illinois courts treat the Board's determination of whether an employee meets the definition of managerial employee as a mixed question of law and fact, and thus we review whether the positions at issue met the requirements of section 6.1(c)(i) under the clearly erroneous standard. *Department of Central Management Services/The Department of State Police v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110356, ¶ 15, 980 N.E.2d 1259.

¶ 31        We recognize section 6.1(d) of the Labor Act (5 ILCS 315/6.1(d) (West Supp. 2013)) creates the presumption any designation made by the Governor under section 6.1 was properly made. Because of the presumption, petitioners had to present sufficient evidence rebutting the presumption.

¶ 32        In this case, the Board found petitioners did not refute the presumption they met both the managerial-authority and management-representation tests set forth in section 6.1(c)(i) of the Labor Act when they (1) monitored Wexford and reported on its compliance and (2) promulgated and implemented administrative and institutional directives. As to all of petitioners' other functions, the Board found they did show those functions did not meet the tests set forth in section 6.1(c)(i).

¶ 33                          1. *Managerial Authority*

¶ 34        In finding the health care unit administrators engaged in executive and management functions in monitoring Wexford, the Board noted the administrators ensured the health care units ran effectively. They were authorized to use discretion as to whether and how to report their observations because they could report the noncompliance immediately or in the monthly report. The Board also found the health care unit administrators determined whether noncompliance by Wexford was of sufficient significance to be reported. Petitioners assert the aforementioned discretion does not broadly affect the DOC's goals and the means of achieving them.

¶ 35        Clearly, providing proper health care to the inmates is a major goal of DOC. It is the largest program under the assistant warden of programs. The evidence showed the health care unit administrators were the frontline DOC employees in ensuring both Wexford complied with the DOC contract and the inmates received, at a minimum, the health care required by law. Assistant Warden Ashby testified he met with his health care unit administrator on a daily basis to ensure the inmates were receiving good medical care. The discretion of when to report noncompliance with the Wexford contract affects how quickly DOC can respond to issues within the health care unit and with the Wexford contract. Moreover, the discretion in determining what deviation from the contract is significant also impacts how effectively the health care unit is run as the more deviations excused, the less effective the unit may run. While the discretion the health care unit administrators did possess was arguably small in size, it was large in impact because they were the DOC employees directly observing and reporting on Wexford's day-to-day operations of the health care unit. Thus, we disagree with petitioners that the health care unit administrator's discretion did not have a broad effect. Accordingly, we find the Board's determination that the objectors failed to prove the health care unit administrators did not engage in management and executive functions in monitoring Wexford was not clearly erroneous.

¶ 36 As to effectuation of the management policies and practices of a state agency, the health care unit administrator's monitoring of Wexford puts into operation the administrative directives, institutional directives, and the DOC contract with Wexford. The health care unit administrator's discretion is the initial enforcement of the policies and practices, as the health care unit administrator makes the initial determination of whether to report the violation and then whether to report it immediately or in the monthly report. Such discretion can have a significant impact on the effectiveness of the health care unit. Ashby emphasized his reliance on the health care unit administrator's opinions. Thus, we find the Board's determination the objectors failed to show the health care unit administrators did not effectuate DOC policies and practices when they monitored Wexford was not clearly erroneous.

¶ 37 Because our review of the entirety of the record does not leave us with a definite and firm conviction that a mistake has been committed, we find the Board properly certified the positions at issue as excluded from collective bargaining under section 6.1 of the Labor Act. Based on our aforementioned finding, we need not address the Board's findings as to the health care unit administrator's role in the promulgation and implementation of administrative and institutional directives.

¶ 38                                   2. *Management Representation*

¶ 39 As a result of our conclusion that the health care unit administrators meet the managerial-authority test when monitoring Wexford, we need not address whether the positions at issue also meet the management-representation test.

¶ 40                                          III. CONCLUSION

¶ 41 For the reasons stated, we affirm the Board's judgment.

¶ 42 Affirmed.