# Illinois Official Reports

## Appellate Court

***American Federation of State, County & Municipal Employees, Council 31 v. State***,
**2018 IL App (1st) 140656**

| | |
|---|---|
| Appellate Court Caption | AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, Petitioner, v. STATE OF ILLINOIS; DEPARTMENT OF CENTRAL MANAGEMENT SERVICES (ILLINOIS COMMERCE COMMISSION); and ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, Respondents. |
| District & No. | First District, First Division<br>Docket No. 1-14-0656 |
| Filed | January 22, 2018 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-RC-11-078. |
| Judgment | Affirmed. |
| Counsel on Appeal | Cornfield & Feldman LLP, of Chicago (Mark Stein and Gail E. Mrozowski, of counsel), for petitioner.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Linda Boachie-Ansah, Assistant Attorney General, of counsel), for respondents. |

JUSTICE MIKVA delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        This is a direct appeal from a final order of the Illinois Labor Relations Board, State Panel (Board), finding that six directors at the Illinois Commerce Commission (Commission) are managerial employees excluded from collective bargaining. The Board denied a representation petition filed by the American Federation of State, County and Municipal Employees, Council 31 (Union), seeking to include the employees in one of its existing bargaining units, and the Union now appeals. For the reasons that follow, we affirm the Board's decision and order with respect to each of the six directors that the Union seeks to represent.

¶ 2                              I. BACKGROUND
¶ 3        The Commission is a quasi-judicial body, charged under the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2016)) with regulating public utilities in the state. *Id.* §§ 2-101, 3-105, 4-101, 4-201, 13-101. The Commission is engaged in, among other things, rate setting, the certification of private entities seeking to provide public utilities, safety oversight, and the investigation and resolution of complaints against utility companies. *American Federation of State, County, & Municipal Employees (AFSCME), Council 31 v. State of Illinois*, 2014 IL App (1st) 130655, ¶ 3 (hereinafter *AFSCME*). The Commission is comprised of five commissioners, who appoint an executive director to oversee its day-to-day operations. 220 ILCS 5/2-101, 2-105(a) (West 2016). The executive director is authorized to organize the Commission into bureaus or other subunits and to delegate the supervision and direction of those bureaus to staff members. *Id.* § 2-105(a). Bureaus are typically headed by chiefs and subdivided into divisions headed by directors. At present, six bureaus and an Office of Retail Market Development report to the executive director.

¶ 4        On October 5, 2010, the Union filed a representation petition with the Board seeking to include nine directors in its RC-63 bargaining unit. The Commission opposed the petition, arguing that the directors are excluded from collective bargaining for three reasons: because they are managerial employees pursuant to section 3(j) of the Illinois Public Labor Relations Act (Labor Relations Act) (5 ILCS 315/3(j) (West 2010)); the directors are supervisory employees, pursuant to section 3(r) (*id.* § 3(r)); and the directors are confidential employees, pursuant to section 3(c) (*id.* § 3(c)). The Commission alternatively argued that, even if the directors are not excluded from collective bargaining, the RC-63 unit is not the appropriate bargaining unit for those employees. The Union ultimately stipulated that three of the nine directors should be excluded from the bargaining unit, leaving the status of only six directors in dispute. They are (1) Torsten Clausen, director of the Office of Retail Market Development; (2) Jerry Oxley, director of Information Technology Services in the Bureau of Planning and Operations; (3) Peter Muntaner, director of Consumer Services in the Bureau of External Affairs; and (4) Harry Stoller, Joy Nicdao-Cuyugan, and Jim Zolnierek, the directors,

respectively, of the Energy, Financial Analysis, and Telecommunications Divisions of the Bureau of Public Utilities.

¶ 5 At an evidentiary hearing in June 2011, the administrative law judge (ALJ) in this case heard testimony primarily from the Commission's executive director and the bureau chiefs to whom these six directors report. In her recommended decision and order issued on February 27, 2013, the ALJ recommended that the Board find that three of the directors (Mr. Clausen, Mr. Oxley, and Mr. Muntaner) were managerial employees excluded from collective bargaining and that the remaining three directors (Mr. Stoller, Ms. Nicdao-Cuyugan, and Mr. Zolnierek) were public employees with full collective bargaining rights. Both the Union and the Commission filed exceptions to the ALJ's recommendations.

¶ 6 The Board agreed in part with the ALJ, finding in its February 14, 2014, decision and order that all six directors were managerial employees. The Union appealed directly to this court. To avoid repetition, where we discuss the Board's finding as to each of the directors below, we include in that discussion a summary of the relevant evidence and the ALJ's recommendations.

¶ 7 Briefing in this case was stayed pending decisions by the Fourth District in *Department of Central Management Services/The Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 131022, and by this district in *American Federation of State, County, & Municipal Employees (AFSCME), Council 31 v. State*, 2016 IL App (1st) 133866-U. The stay was lifted in January 2017.

¶ 8                                                    II. JURISDICTION

¶ 9 The Board entered its final order, dismissing the Union's petition in this matter on February 14, 2014, and the Union timely filed its petition for review on March 10, 2014. Orders of the Board dismissing representation petitions are final orders and may, in accordance with provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)), be appealed directly to the appellate court for the district in which the aggrieved party resides or transacts business. 5 ILCS 315/9(i) (West 2010). We have jurisdiction over this matter pursuant to section 9(i) of the Labor Relations Act (*id.*), section 3-113 of the Code of Civil Procedure (735 ILCS 5/3-113 (West 2012)), and Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994).

¶ 10                                                    III. ANALYSIS

¶ 11 The issue before us is whether the Board properly classified each of these six Commission directors as managerial. By law, an employee's classification determines his or her right to engage in collective bargaining. The Labor Relations Act, which allows public employees to bargain collectively (5 ILCS 315/2.5(1) (West 2010)), specifically excludes "managerial employees" from the definition of a "[p]ublic employee" (*id.* § 3(n)). As our supreme court has explained, "[t]he exclusion is intended to maintain the distinction between management and labor and to provide the employer with undivided loyalty from its representatives in management." *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 339 (1997). In accordance with these goals, "managerial status is not limited to those at the very highest level of the governmental entity." (Internal quotation marks omitted.) *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 301 (1995). Rather, "it is enough if the functions performed by the employee[s] sufficiently align [them] with management such that the employees should not be in a position

- 3 -

requiring them to divide their loyalty to the administration \*\*\* with their loyalty to an exclusive collective-bargaining representative." (Internal quotation marks omitted.) *Id.*

¶ 12    On review from this final order by the Board, we apply different levels of deference depending on the nature of the question presented. Although we consider an agency's ruling on issues of law *de novo*, we deem its findings on issues of fact to be *prima facie* correct unless they are against the manifest weight of the evidence. *Speed District 802 v. Warning*, 242 Ill. 2d 92, 111-12 (2011); 735 ILCS 5/3-110 (West 2012). We also defer to an agency's experience and subject-matter expertise when considering mixed questions of law and fact and will reverse the agency's findings on mixed questions only if they are clearly erroneous. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). A finding is clearly erroneous when "the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 13    Here, the Union does not challenge the Board's findings of fact, but contends both that the Board applied incorrect legal standards and that its ultimate conclusions—that each of the six directors were managerial employees—were clearly erroneous. We first consider the proper legal standards.

¶ 14                    A. Whether the Board Applied the Correct Legal Standards

¶ 15    The Union contends that the Board applied an improper legal standard in two respects. It first argues that the Board should not have relied on this court's recent interpretation in *AFSCME*, 2014 IL App (1st) 130655, ¶ 29, of the word "predominantly" in section 3(j) of the Labor Relations Act to mean "superiority in importance or numbers." According to the Union, *AFSCME* improperly introduced an alternative, qualitative, definition of predominance that contradicts other decisions of this court, which the Union contends look only to whether the employee spends most of his or her time on managerial activities. According to the Union, this interpretation "threatens to make [the predominance] requirement a nullity."

¶ 16    The Union also argues—this time relying on our decision in *AFSCME*—that the Board applied an improper legal standard when it concluded that two of the directors, Torsten Clausen and Harry Stoller, were managerial employees based solely on their function as informational "gatekeepers." In making this determination, the Union argues that the Board improperly relied on one of its own prior decisions, which was subsequently reversed by this court in *AFSCME*, 2014 IL App (1st) 130655, ¶¶ 42-43. We consider each of these arguments in turn, in the context of the legal framework for determining whether a particular employee is managerial.

¶ 17    Section 3(j) of the Labor Relations Act establishes a two-part test to determine if an individual is a "[m]anagerial employee." 5 ILCS 315/3(j) (West 2010). The person must be both (1) "engaged predominantly in executive and management functions" and (2) "charged with the responsibility of directing the effectuation of management policies and practices." *Id.*

¶ 18    Courts have construed the phrase "executive and management functions" in the first part of the test to mean those functions that "relate to running a department," including "formulating department policy, preparing the budget, and assuring efficient and effective operations of the department." *Village of Elk Grove Village v. Illinois State Labor Relations Board*, 245 Ill. App. 3d 109, 121-22 (1993). An employee is not managerial simply because he or she "exercise[s]

*** professional discretion and technical expertise" (*County of Cook v. Illinois Labor Relations Board-Local Panel*, 351 Ill. App. 3d 379, 386 (2004)) or performs duties that are "essential to the employer's ability to accomplish its mission" (*Department of Central Management Services/The Department of Healthcare & Family Services v. Illinois Labor Relations Board, State Panel*, 388 Ill. App. 3d 319, 331 (2009)). And an employee whose policymaking role is merely "advisory and subordinate" will generally not be considered managerial (*Village of Elk Grove Village*, 245 Ill. App. 3d at 122) unless he or she makes "effective recommendations" (internal quotation marks omitted), *i.e.*, recommendations that are almost always adopted by management (*Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 775-77 (2010) (hereinafter *CMS/ICC*)). Managerial employees "possess and exercise authority and discretion which broadly effects [*sic*] a department's goals and means of achieving its goals." (Internal quotation marks omitted.) *County of Cook*, 351 Ill. App. 3d at 386.

¶ 19        The second part of the statutory test emphasizes that a managerial employee's authority "extends beyond the realm of theorizing and into the realm of practice." *CMS/ICC*, 406 Ill. App. 3d at 774. In other words, "[a] managerial employee not only has the authority to make policy but also bears the responsibility of making that policy happen." *Id.* at 774-75. Such an individual "oversees or coordinates policy implementation through [the] development of means and methods of achieving policy objectives, determines the extent to which the objectives will be achieved, and is empowered with a substantial amount of discretion to determine how policies will be effected." *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 87 (1996).

¶ 20        We reject the Union's first argument that it was improper for the Board to construe the word *"predominantly"* in section 3(j) of the Labor Relations Act to mean either "superiority in importance or numbers." As the Union acknowledges, that construction was recently articulated by this court in *AFSCME*, 2014 IL App (1st) 130655, ¶¶ 28-29, where we were asked to consider the managerial status of three attorneys working in the Commission's solicitor section. Noting that the "strict numerical approach" had been rejected in similar cases (see *Secretary of State v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 111075, ¶ 110; *Department of Central Management Services*, 278 Ill. App. 3d at 86) and that the word "predominant" can mean "superiority in importance or numbers," we concluded that the amount of time an employee spends on managerial tasks is not determinative of the employee's managerial status. (Internal quotation marks omitted.) *AFSCME*, 2014 IL App (1st) 130655, ¶¶ 29, 31.

¶ 21        The Union insists that this definition of "predominantly" is at odds with statements in certain of our prior opinions. In *CMS/ICC*, 406 Ill. App. 3d at 774, for example, we noted that the first part of section 3(j) of the Labor Relations Act "describes the nature of the work *to which the individual devotes most of his or her time*." (Emphasis added.) However, the focus of that case was whether the Commission's ALJs were effective decisionmakers because their recommendations were accepted by the Commission almost all of the time, not what percentage of the time the ALJs were engaged in any particular activities. *Id.* at 779.

¶ 22        The Union has failed to persuade us that a few apparently contradictory words in an earlier case require us to reject the well-reasoned construction of the word "predominantly" presented in *AFSCME*. And the Union's reference to section 3(r) of the Labor Relations Act, defining a

"supervisor" as someone who, among other things, "devote[s] a preponderance *of their employment time* to exercising [supervisory] authority" (emphasis added) (5 ILCS 315/3(r) (West 2010)), merely highlights language that could have been, but was not, included in section 3(j)'s definition of a managerial employee. Thus, we reject the Union's first complaint about the Board's legal analysis.

¶ 23 In reference to its second legal argument, we agree with the Union that it would have been incorrect for the Board to conclude that an employee who functions as an informational gatekeeper must necessarily be a managerial employee. In *AFSCME*, 2014 IL App (1st) 130655, ¶¶ 42-43, we held that a Commission lawyer who merely flagged issues for her supervisors to review was not a managerial employee, absent other responsibilities bringing her within the statutory definition. We rejected the Board's argument in that case that the employee effectively decided whether the Commission would act on a particular issue because issues not flagged by her would not be considered by the Commission. We concluded that such policymaking "through omission," by an employee who did not "even recommend a particular course of action," was a "limited" and "tenuous" form of influence that could only result from the employee's inadequate performance of her duties, *i.e.*, her failure to identify issues of import to the Commission.

¶ 24 In this case, however, as discussed in more detail later in this opinion, we conclude that the Board's findings that Torsten Clausen and Harry Stoller were managerial employees should be upheld. Although the Board relied on Mr. Clausen's role as an informational gatekeeper, its conclusion that he was a managerial employee can be upheld on the alternative basis that the statute that created his job makes it clear that he is a manager as a matter of law. And this court may affirm the decision of an administrative agency when justified in law "for any reason disclosed by the record." *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 48. Although the Board also cited Mr. Stoller's "gatekeeping" functions, its determination that he was a managerial employee was based on the fact that Mr. Stoller has ultimate responsibility for making certain Commission decisions and is furthermore supported by other evidence of his managerial functions. Thus, while we accept the Union's point that gatekeeping is, on its own, insufficient to classify an employee as a manager, that point ultimately does not provide a basis for overturning any part of the Board's decision here.

¶ 25 ## B. The Board's Findings

¶ 26 Within this legal framework, we review for clear error the Board's findings that each of the six directors that the Union seeks to bring within the bargaining unit is a managerial employee.

¶ 27 ### 1. Torsten Clausen

¶ 28 Torsten Clausen is the Director of the Commission's Office of Retail Market Development (Office). Tim Anderson, the Commission's executive director, testified that the Office was created by the Retail Electric Competition Act of 2006 (Act) (220 ILCS 5/20-101 *et seq.* (West 2012)), and that Mr. Clausen is the first person to serve as its director. Unlike other directors, who report to their respective bureau chiefs, Mr. Clausen reports directly to Mr. Anderson.

¶ 29 After considering the testimony and other evidence regarding Mr. Clausen's duties, the ALJ determined that his role within the Commission was, in many ways, advisory. But the ALJ nevertheless concluded that Mr. Clausen was a managerial employee because the statutory provisions creating the Office authorize him to propose, directly to the General Assembly and

to the governor, those legislative actions he deems necessary to address barriers to competition in the retail electric market. In this role, the ALJ found that Mr. Clausen "exercises sufficient authority and discretion in discharging the [Commission]'s mission" to be considered a managerial employee as a matter of law.

¶ 30    The parties, the ALJ, and the Board all refer to two separate tests for determining whether an employee is managerial: the "traditional" two-part statutory test and an "alternative" "matter of law" test purportedly established by our supreme court in *Cook County State's Attorney*, 166 Ill. 2d 296, and *Chief Judge of the Sixteenth Judicial Circuit*, 178 Ill. 2d 333, pursuant to which an employee may be considered managerial as a matter of law if the employee is authorized to act as a surrogate for the employer. Some of the previous decisions of this court have also referred to two separate tests. See, *e.g.*, *Department of Central Management Services/Pollution Control Board v. Illinois Labor Relations Board, State Panel*, 2013 IL App (4th) 110877, ¶ 22 (noting the appellate court's use of the two tests). However, the supreme court itself does not refer to an "alternative test," and a close reading of those two supreme court cases confirms that its findings, though made as a "matter of law," were still based on the statutory definition of a managerial employee found in section 3(j) of the Labor Relations Act (5 ILCS 315/3(j) (West 2010)). See *Cook County State's Attorney*, 166 Ill. 2d at 302 (holding as a matter of law that "assistant State's Attorneys must be regarded as managerial employees, *as that term is defined in the [Labor Relations Act]*" (emphasis added)); *Chief Judge of the Sixteenth Judicial Circuit*, 178 Ill. 2d at 347 (holding as a matter of law that "assistant public defenders meet the definition of managerial employee *under the Act*" (emphasis added)). We believe that in these two cases our supreme court simply recognized the fact that a statute that creates a public office and case law regarding the duties of the public employees at issue may make it apparent that the employees are managerial, eliminating any need to examine a factual record. See *Cook County State's Attorney*, 166 Ill. 2d at 305 (holding that "statutes and case law articulating the powers and duties" of an office may "provide sufficient grounds for determining this issue as a matter of law").

¶ 31    Here, the Board did not adopt the ALJ's finding that Mr. Clausen was managerial as a matter of law, but instead determined that Mr. Clausen was a managerial employee based on evidence that he performed a gatekeeping function. As we discussed above, we adhere to our holding in *AFSCME*, 2014 IL App (1st) 130655, ¶¶ 42-43, that gatekeeping alone is insufficient to establish managerial status. However, we agree with the ALJ that—like assistant state's attorneys and assistant public defenders, whom our supreme court has found to be managerial as a matter of law—Mr. Clausen's statutorily defined duties make it apparent that he is a manager.

¶ 32    The Office of Retail Market Development was created in 2006 by the Act. 220 ILCS 5/20-101 *et seq.* (West 2012). The Act provides that the Office's director is to "oversee" the Office and has authority to employ at least two professional staff members to help carry out its mission. *Id.* § 20-110. The Act establishes the director as the individual in charge of researching, developing, and presenting—not just to the Commission, but also to the General Assembly and to the governor—an initial "detailed plan designed to promote, in the most expeditious manner possible, retail electric competition for residential and small commercial electricity consumers." *Id.* § 20-120. Where this initial plan calls for the Commission to take action, the Commission is required to expeditiously do so. See *id.* ("To the extent the plan calls for Commission action, the Commission *shall* initiate any proceeding or proceedings called for

in the final plan within 60 days after receipt of the final plan and complete those proceedings within 11 months after their initiation." (Emphasis added.)). And as the ALJ pointed out, on an ongoing basis, the REC Act requires the director to submit an annual report to the Commission, the General Assembly, and the governor, describing the office's accomplishments and issuing recommendations for "administrative and legislative action necessary to promote further improvement in retail electric competition." *Id.* § 20-110.

¶ 33    Although we rely on different reasoning than that employed by the Board, we agree with its determination that Mr. Clausen, the Director of the Office of Retail Market Development, is a managerial employee excluded from collective bargaining.

¶ 34                                              2. Jerry Oxley

¶ 35    Jerry Oxley is the director of Information Technology Services, one of three divisions within the Commission's Bureau of Planning and Operations. Kenneth Hundreiser, the bureau's chief, testified that Mr. Oxley's division develops all of the software used by the Commission and is responsible for "[t]he network, the web, intranet, internet, [and] things of that nature." Nine positions currently report directly to Mr. Oxley, and eight others do so indirectly. All but one of the individuals in those positions are members of a bargaining unit.

¶ 36    By Mr. Hundreiser's estimate, Mr. Oxley spends approximately 24% of his time on personnel tasks, including conducting employee evaluations and performance reviews for his staff. Mr. Hundreiser testified that, although he reviews these evaluations and has made corrections for minor things like spelling, he approves the content of Mr. Oxley's evaluations "100 percent" of the time. However, Mr. Oxley's own testimony, supported by e-mail exchanges submitted by the Union, indicated that Mr. Hundreiser sometimes disagreed or even "extremely disagreed" with the substance of the evaluations Mr. Oxley prepared, resulting in "some necessary adjustments." Although Mr. Oxley can independently approve or reject his staff's requests for time off or for flexible work schedules, overtime requests for nonemergencies must be approved by both Mr. Hundreiser and Mr. Anderson. But, according to Mr. Hundreiser, "whatever Jerry recommends" in this regard "is always approved" because "[i]t's obviously needed if he proposes it." Mr. Oxley has authority to discipline his subordinates and, according to Mr. Hundreiser, has exercised this authority to issue an oral reprimand placing a subordinate on quarterly review. Mr. Oxley has yet to participate in the hiring process as a director because no new employees have been hired in his division. According to Mr. Hundreiser, although hiring decisions must ultimately be approved by the executive director, recommendations from directors like Mr. Oxley are generally accepted.

¶ 37    Mr. Oxley also has the authority to resolve first-level grievances and recommend that staff within his division be promoted. However, on the two occasions when he recommended that certain employees receive promotions to conform their job titles to the tasks they were performing, his recommendations were not followed. Mr. Oxley testified that, as a result, he was unable to resolve a grievance later filed on this basis. When Mr. Oxley was asked if he agreed with Mr. Hundreiser's statement that Mr. Oxley had the authority to grant back pay in response to a grievance, Mr. Oxley stated "[a]bsolutely not."

¶ 38    Mr. Oxley conducts both on-the-job and formal training for his staff and directs them to perform specific tasks. He is also involved with IT training for Commission employees outside of his division. Although he has authority to disseminate standard electronic equipment to

Commission employees, Mr. Oxley must obtain approval before granting requests for "extras," like second monitors.

¶ 39   In addition to these duties, Mr. Oxley frequently fills in for his staff when needed and presently spends a significant portion of his time staffing the IT help desk. Help desk employees respond to e-mails and telephone calls from users with computer problems. Mr. Oxley assists when a difficult problem arises or when the volume of requests is too high for the three dedicated call center employees to manage. Mr. Oxley described his duties relating to the help desk as "[e]xtensive[ ]." Although he generally spends upwards of 20-25% of his time there, he testified that in the three months leading up to the hearing in this matter, he spent closer to 75% of his time on tasks related to the call center. Although he does not generally program, Mr. Oxley testified that he will sometimes "make small applications" as temporary fixes until other staff can develop permanent solutions.

¶ 40   Mr. Hundreiser testified that, within the area of information technology, Mr. Oxley has the authority to establish policies that affect the entire agency and that he does so by assessing both the Commission's current needs and trends in the industry, then drafting policies based on CMS guidelines, best practices, or "what [Mr. Oxley] knows in the field." Mr. Hundreiser testified that he generally accepts the substance of Mr. Oxley's policy proposals. Mr. Hundreiser could recall three agency-wide policies that Mr. Oxley drafted: a policy governing website enhancements; a revision to an existing internet, e-mail, and computer use policy, which was approved but not implemented; and a policy governing the submission and processing of IT requests by Commission staff. Mr. Oxley also drafts all of the division's desk procedures—what Mr. Hundreiser described as policies regarding "[h]ow to do something within the [IT] division"—and these are not reviewed by Mr. Hundreiser or Mr. Anderson.

¶ 41   The Commission's "Position Description" for the director of information technology states that the director "[e]stablishes [IT] Program objectives consistent with Commission practice and policy," "[s]ets the substantive agenda for the Program by generating and/or reviewing project proposals *** and recommending their adoption," including "review and recommendation of associated budgets," prepares "one and five-year Strategic Information Plan[s]," "represents the [Commission] in negotiations with [CMS] for related purchases and contracts," "[a]ssists the Bureau Chief in the formulation and implementation of Division policy and administrative matters," "[e]valuates the performance of staff assigned to the [IT] Program on a periodic basis and recommends compensation adjustments," "[r]ecruits applications for approved staff positions within the Program and makes recommendations *** on candidate selection," and "[d]evelops the Program's professional training and development policy."

¶ 42   In a performance evaluation, Mr. Hundreiser noted that Mr. Oxley "plays an integral part in the development of the annual IT Projects and Priorities Plan *** as well as *** the IT Steering Committee" and that he developed a "Case Management Document Library."

¶ 43   Based on this evidence, the ALJ concluded that Mr. Oxley was a managerial employee. She determined that he met the first part of the statutory definition because he exercised authority and independent judgment to broadly affect the Commissions operations. The ALJ noted that Mr. Oxley formulated two important policies—one for website changes and one for IT requests—that, although they related only to information technology systems, broadly affected the Commission's operations. The ALJ also found it significant that, although Mr. Oxley could not unilaterally make policy changes, he was an effective decisionmaker because

the policies he proposed were consistently approved by his bureau chief. Mr. Oxley also had the authority to implement desk procedures to solve routine IT problems without first obtaining approval. The ALJ determined that Mr. Oxley also met the second part of the statutory definition because he was directly involved in implementing the Commission's IT policies and running its IT programs, as evidenced by the fact that he frequently developed short-term solutions necessary for the agency to run until long-term solutions were developed.

¶ 44     The Board agreed with the ALJ. It concluded that, "even though he ha[d] only formulated two policies over a span of 10 years," Mr. Oxley still "predominantly perform[ed] executive and management functions" because "he perform[ed] additional functions which satisf[ied] the [statutory] test," including "helping determine the IT means by which the agency achieves its objectives." The Board found it significant that Mr. Oxley created a case management system and performance evaluations that were used throughout the Commission. The Board further concluded that, as head of the IT division, Mr. Oxley "likely [wa]s ultimately responsible for deployment of the division's resources." Like the ALJ, the Board considered Mr. Oxley to be an effective decisionmaker, as the Commission had accepted all of his policy recommendations. The Board did not feel that the recent need for Mr. Oxley to spend a significant portion of his time manning the IT help desk precluded this finding.

¶ 45     On appeal, the Union argues that the Board's determination is clearly erroneous because it "was largely based on the assumption that anyone who is the top IT employee for a State agency is a manager." The Union contends that this conclusion is based on a misreading of the Fourth District's decision in *CMS/ICC*, 406 Ill. App. 3d at 778. According to the Union, that case stands for the proposition that an employee is managerial if he has "job functions that encompass the whole of an agency's mission." It is true that the court in *CMS/ICC* concluded that the Commission's ALJs were managerial by "compar[ing] the job functions of th[e] ALJs to the overall mission of the [Commission]," but the court clearly stated that this was but "[o]ne way of approaching" the relevant question, which is whether "the responsibilities of a job title encompass the agency's entire mission, *or a major component of its mission*." (Emphasis added.) *Id.* Here, the Board concluded that Mr. Oxley's job responsibilities encompass a major component of the agency's mission because he "helps determine the 'IT means' by which the Commission achieves its objectives." This conclusion is not clearly erroneous.

¶ 46     We affirm the Board's finding that Mr. Oxley, the director of Information Technology Services, is a managerial employee excluded from collective bargaining.

¶ 47                                    3. Peter Muntaner

¶ 48     Peter Muntaner is the director of the Consumer Services Division of the Commission's Bureau of External Affairs. Randy Nehrt, the bureau's chief, testified that Mr. Muntaner's division "primarily handles constituent complaints and sets policy matters that balance the interests of consumers and utilities." Four positions currently report directly to Mr. Muntaner, and fifteen others do so indirectly. Each of Mr. Muntaner's reports is part of a bargaining unit.

¶ 49     Mr. Muntaner approves requests for time off and is authorized to discipline his subordinates at certain levels without approval. Although he exercised this authority to conduct a pre-disciplinary hearing that led to an employee's five-day suspension, it is not clear that Mr. Muntaner is the one who made the decision to issue the suspension. Mr. Muntaner also has authority to hear first-level employee grievances, though Mr. Nehrt could not recall him

ever having to do so. Although Mr. Muntaner can request overtime for his subordinates, such requests must be approved by Mr. Anderson. Mr. Muntaner has in the past requested compensatory time for employees who traveled to a hearing, and those requests were approved by Mr. Nehrt. Mr. Muntaner is responsible for conducting performance evaluations for his staff, which he submits to Mr. Nehrt for approval. Mr. Nehrt testified that he has never rejected one of Mr. Muntaner's proposed evaluations. Mr. Muntaner has authority to interview and recommend individuals for hire but has not yet done so, although he did start the process recently to replace someone who retired.

¶ 50    Mr. Nehrt estimated that Mr. Muntaner spends about 50% of his time directing and supervising the work of his subordinates. He has also been heavily involved in the rulemaking process with respect to the statutory provisions governing the customer service, billing and payment, and discontinuance of service practices of public utilities. Mr. Muntaner also has refined practices regarding consumer complaints "to make [the complaint] process more effective and efficient." According to Mr. Nehrt, Mr. Muntaner drafts new procedures and policies when necessary, and "[w]hen emerging issues arise or new issues come up, Mr. Muntaner will also update procedures to provide to counselors *** for how to handle those new or emerging issues."

¶ 51    When Mr. Muntaner took over as director of the Commission's Consumer Services Division, he reviewed the procedures for investigating consumer complaints; sought input from the relevant managers, administrative staff, and policy analysts; and updated those policies, forwarding them to Mr. Nehrt for review. To standardize investigations, Mr. Muntaner also formulated a list of information that his division's counselors would seek from public utility providers during the course of their investigations, which was approved by Mr. Nehrt. Mr. Muntaner also drafted, and Mr. Nehrt approved, a policy to ensure that informal complaints were processed in time to notify customers if the limitations period for filing a formal complaint was approaching.

¶ 52    The ALJ was persuaded that Mr. Muntaner was a managerial employee by his establishment of policies and procedures for his division, which, she noted, "serves as the face of the ICC for the average citizen, thus establishing its importance within the agency." Although Mr. Muntaner lacks authority to make unilateral policy changes, the ALJ concluded that the first part of the statutory definition was satisfied because Mr. Muntaner makes effective recommendations; all three of the procedures he drafted were approved and implemented. And his role in training customer service counselors to follow those new policies satisfied the second part of the definition as well. The Board agreed with the ALJ that Mr. Muntaner was "a managerial employee based on his effective recommendation of policies and procedures concerning the response and processing of consumer complaints."

¶ 53    In support of its argument on appeal that the Board's finding is clearly erroneous, the Union seizes on the Board's statement in its decision and order that "Muntaner is likely predominantly engaged in such managerial functions by virtue of his position as head of the Consumer Affairs Division." The Union insists that this statement demonstrated that the Board's conclusion was improperly based on speculation concerning what someone with his job title *probably* does, rather than the facts concerning his actual role at the Commission. We do not agree. In support of the statement, the Board cited its prior decision in *American Federation of State, County & Municipal Employees, Council 31 v. State of Illinois*, 30 PERI ¶ 38 (ILRB State Panel 2013), in which it concluded that an individual's position as the top

- 11 -

employee in an agency's IT department, "together with" several concrete examples of the employee's authority to broadly affect the agency's operations and his coordination of policy implementation, "strongly suggest[ed]" that the employee was predominantly engaged in management functions. *Id.* There, as here, the employee's title was merely one piece of relevant evidence; it was not the sole basis for the Board's determination regarding the employee's status. Although we agree with the Union that an employee's managerial status cannot be determined from his title alone, there was ample evidence of Mr. Muntaner's ability to initiate and implement Commission policy.

¶ 54 The Union also focuses on Mr. Nehrt's estimate that Mr. Muntaner spends a "combined" 50% of his time on personnel-related duties, reviewing the work of his subordinates, and researching and updating policies and procedures. The Union reasons that this means that Mr. Muntaner necessarily spends less than 50% of his time influencing policy and cannot be said to be "engaged predominantly in executive and management functions." 5 ILCS 315/3(j) (West 2010). For the reasons discussed above, we adhere to our decision in *AFSCME*, 2014 IL App (1st) 130655, ¶ 29, in which we rejected this purely quantitative construction of the word "predominantly" as it is used in section 3(j) of the Labor Relations Act.

¶ 55 We thus affirm the Board's finding that Mr. Muntaner, the director of the Consumer Services Division, is a managerial employee excluded from collective bargaining.

¶ 56                          4. The Public Utilities Directors

¶ 57 Gene Beyer, chief of the Bureau of Public Utilities, testified that his bureau is divided into three divisions. Energy, headed by Harry Stoller, is concerned with issues affecting the electric and gas industries; Financial Analysis, headed by Joy Nicdao-Cuyugan, is primarily involved in rate design, individual rate cases, and utility audits; and Telecommunications, headed by Jim Zolnierek, deals with state-level regulation of telephone companies and some aspects of the provision of wireless cable and internet services. These three employees are the three remaining directors that the Union seeks to bring within the bargaining unit.

¶ 58            a. Common Duties and Responsibilities of the Public Utilities Directors

¶ 59 The three public utilities directors share many of the same responsibilities. All three work with Mr. Beyer in Springfield and attend biweekly bureau meetings with Mr. Beyer and the Commission's executive director, Mr. Anderson. And each serves as the spokesperson for his or her division when the bureau's overall budget is allocated.

¶ 60 According to Mr. Beyer, "from time to time," each of the directors appears before and makes presentations to the Commission, the legislature, or various outside groups, although this function is also sometimes performed by the directors' subordinates. Although directors sometimes prepare written testimony or provide live testimony at hearings in docketed cases before the Commission, more often than not that is done by the managers and analysts that make up the directors' staffs.

¶ 61 The Commission's Legislative Affairs Office may request a position paper outlining the Commission's position on particular proposed legislation. Such requests generally go to the director of the division, who prepares the paper or supervises its preparation, and circulates it for review to other interested divisions. Mr. Stoller and Ms. Nicdao-Cuyugan have each drafted such a position paper. And Mr. Zolnierek has attended several meetings with

legislators to answer their questions and provide the Commission's perspective when the telecommunications laws were rewritten.

¶ 62 By Mr. Beyer's estimate, Mr. Stoller, Ms. Nicdao-Cuyugan, and Mr. Zolnierek each spend approximately 20-30% of their time on personnel issues. Each has the authority to recommend overtime for members of his or her staff, although such requests must also be approved by Mr. Beyer. Mr. Stoller and Ms. Nicdao-Cuyugan have each submitted such requests, but Mr. Zolnierek never has. The requests are usually granted. Mr. Beyer testified that he recalled denying a request only once, when the overtime was not approved in advance and did not involve an emergency. Each of the directors also prepares annual performance evaluations for his or her subordinates, which are reviewed and approved by Mr. Beyer. Although Mr. Beyer has, on occasion, suggested changes in the way an evaluation is worded, he stated that he "never make[s] changes to [the directors'] overall performance ratings" or "to their comments on a person's performance." The directors also have the authority to make recommendations regarding disciplinary action—so long as it falls within what is contemplated by the Commission's employee manual and any applicable union contract—and first-level employee grievances. However, these recommendations must be reviewed by the human resources department and approved by Mr. Beyer. To Mr. Beyer's knowledge, Mr. Stoller, Ms. Nicdao-Cuyugan, and Mr. Zolnierek have never had occasion to discipline an employee or resolve a grievance.

¶ 63 Each of the public utilities directors also plays a role in the hiring process, by assessing and articulating their division's needs, interviewing candidates, and—as members of a hiring panel—making hiring recommendations to Mr. Beyer and Mr. Anderson. Mr. Beyer testified that he was not aware of any instance in which a hiring recommendation of Mr. Stoller or Ms. Nicdao-Cuyugan had ever been rejected. And Mr. Zolnierek has had no opportunity to make such recommendations, as the telecommunications division is relatively small and has had no open positions since he became its director. Additionally, on one occasion when Ms. Nicdao-Cuyugan's first and second choice candidates for a position declined a job offer, her recommendations that the position be reposted and, as an interim measure, that additional training be provided for existing employees in other divisions were followed.

¶ 64 Each of these three directors is also responsible for directing and supervising the work of subordinates and overseeing their training. Training within Mr. Stoller's division is, in large part, formal training presented by the federal government relating to pipeline safety, but there is also informal on-the-job training and sometimes other formal training seminars. Any special requests for training or work involving travel must be approved by Mr. Stoller. Ms. Nicdao-Cuyugan conducts in-house training on how to handle rate cases for all new employees in her division, which Mr. Beyer described as "one of the greater responsibilities in that division." In recent years she also arranged for a "rate making tutorial" to explain the ratemaking process to employees in other divisions within the Commission. Because of its small size, training in Mr. Zolnierek's division focuses on familiarizing staff members with each other's work.

¶ 65 b. Specific Duties and Responsibilities of the Public Utilities Directors

¶ 66 In addition to this evidence regarding their shared authority and responsibilities, evidence was also presented at the administrative hearing regarding the specific roles played by the three

public utilities directors.

¶ 67                                    i. Harry Stoller

¶ 68        Mr. Beyer testified that Mr. Stoller, as director of the Energy Division, works with his staff to review new cases as they are filed in order to identify issues affecting the electric and gas industries. The decision as to whether a particular matter warrants the division's involvement may be made, without Mr. Beyer's approval, either by Mr. Stoller or by one of his subordinates. Mr. Beyer acknowledged that "some of those issues and cases are somewhat routine."

¶ 69        However, according to Mr. Beyer, Mr. Stoller "represent[s] the division at times as only a division director can in speaking on policies and on methods *** that affect his division as a whole" and "that wouldn't be appropriate for his direct reports to address." For example, Mr. Stoller is the official contact for communications between the Energy Division and public utility companies regarding docketed matters, including the division's position on proposed settlements. Mr. Stoller has also recommended, on at least two occasions, that citation cases be brought against noncompliant companies, and those recommendations were adopted by the Commission, following approval by Mr. Beyer and the executive director.

¶ 70        A performance review of Mr. Stoller also indicates that he is "occasionally called to the legislature to testify about legislation or to meet with legislators about legislative proposals and has always been an excellent and effective representative for the [Commission] in that role."

¶ 71        Mr. Beyer also testified that Mr. Stoller "has authority to draft policy for his division" and, as its representative, has participated in the drafting of policies, like a case management policy, that affects multiple divisions within the Commission. The Commission's job description for Mr. Stoller's position also indicates that he "formulates and interprets policies of the Agency as pertains to [his] Division's operation"; "[i]nitiates and establishes policies, standards, and procedures for all operations within the general policy framework of the agency"; and "[d]evelops the Division's professional training and development policy."

¶ 72        Through its Federal Energy Program (FEP), the Commission sometimes intervenes on behalf of Illinois retail energy consumers in Federal Energy Regulatory Commission (FERC) proceedings. According to a performance review, Mr. Stoller "is ultimately responsible for the agenda of the [FEP], assuring that it focuses on issues of economic significance to Illinois electric and natural gas retail customers."

¶ 73        The ALJ concluded that Mr. Stoller did not meet the statutory definition of a managerial employee. In the ALJ's view, although the record established that Mr. Stoller played a role in the drafting of policies and in the Commission's rulemaking process, there was "no basis to determine whether [that role was] merely perfunctory and advisory or whether it [wa]s sufficient to satisfy the first prong of the statutory definition."

¶ 74        The Board disagreed, concluding that Mr. Stoller was a managerial employee excluded from collective bargaining. The Board reasoned that "Stoller [wa]s a managerial employee within the meaning of the Act because he act[ed] as a gatekeeper by making the final decision as to which [FERC] proceedings warrant[ed] the Commission's attention and participation."

¶ 75        On appeal, the Union urges us to reverse the Board's finding that Mr. Stoller is a managerial employee because the Board's determination hinged on Mr. Stoller's role as a "gatekeeper." The Union relies on our recent opinion in *AFSCME*, 2014 IL App (1st) 130655,

¶¶ 42-43, where we held that an attorney who served as a gatekeeper by flagging issues of potential interest for review by her superiors was not a managerial employee. But here the Board found that Mr. Stoller was a gatekeeper in the sense that he makes the "final decision" as to which FERC proceedings the FEP recommends for Commission participation. This is the inverse of the function of the gatekeeping lawyer in *AFSCME*, who could influence policy only by omission, *i.e.*, by failing to flag matters that were of interest to her superiors. *Id.* We agree with the Board that this is an important distinction. In addition, as the Board points out, there is evidence in the record both that Mr. Stoller has represented the Commission before the legislature and that he has the authority to establish policies and procedures for his division. We are not "left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted) (*AFM Messenger Service*, 198 Ill. 2d at 395) and cannot conclude that the Board's finding was clearly erroneous.

¶ 76    We affirm the Board's finding that Mr. Stoller, the director of Energy, is a managerial employee excluded from collective bargaining.

¶ 77                          ii. Joy Nicdao-Cuyugan

¶ 78    The ALJ concluded that Ms. Nicdao-Cuyugan, director of the Financial Analysis Division, was not a managerial employee. In the ALJ's view, the record failed to establish that Ms. Nicdao-Cuyugan had any authority to draft policies or played any role in the Commission's rulemaking process.

¶ 79    The Board disagreed, noting several examples of Ms. Nicdao-Cuyugan's "self-initiated, broadly-applicable policy changes," including the steps she took to propose and help develop an intranet site used by employees throughout the Commission to access important documents, her identification and implementation of an internal e-mail policy saving the Commission thousands of dollars annually in network storage costs, and her recommendation to reject an overly restrictive policy concerning staff data requests. For the Board, the fact that Ms. Nicdao-Cuyugan initiated and implemented all of these changes in the span of one employee evaluation period "strongly suggest[ed] that she [wa]s predominantly engaged in executive and management functions."

¶ 80    On appeal, the Union characterizes the examples relied on by the Board as nothing more than "IT solutions to IT problems." The Union's argument appears to be that these examples do not establish Ms. Nicdao-Cuyugan's management of the Financial Analysis Division. This argument is not persuasive. In an age where employees use technology to communicate, store and retrieve data, and create their work product, it makes sense that much, if not most, policymaking involves an IT component. The Union has provided no authority suggesting that "executive and management functions" do not include the effective coordination between departments to devise broad-based solutions.

¶ 81    We affirm the Board's finding that Ms. Nicdao-Cuyugan, the director of Financial Analysis, is a managerial employee excluded from collective bargaining.

¶ 82                          iii. Jim Zolnierek

¶ 83    Although Mr. Zolnierek, the director of the Telecommunications Division, has authority to draft policies for his division, Mr. Beyer could not recall any specific policies he has drafted. Mr. Beyer added, however, that Mr. Zolnierek has recently worked with staff from other

divisions to develop a policy for tracking and coordinating action taken with respect to noncompliant telephone companies. He has also participated in the rulemaking process, in that "he initiated a project to review all of the administrative code parts of [the Commission's] rules that apply to telecommunications to determine whether or not they needed to be revised or eliminated." Without prior approval by Mr. Beyer or the executive director, Mr. Zolnierek reached out to Commission employees in other divisions and bureaus, including to other bureau chiefs, for assistance with these efforts. That process is ongoing and Mr. Beyer did not know whether any of the specific changes proposed by Mr. Zolnierek had been approved. The Commission did, however, act on Mr. Zolnierek's recommendation to begin formal rulemaking to edit and eliminate certain rules that had been affected by recent changes in federal telecommunications laws.

¶ 84     Although she acknowledged that it was a closer case than for the other public utilities directors, the ALJ ultimately concluded that the record also fails to establish that Mr. Zolnierek was a managerial employee under the first part of the statutory test. In the ALJ's view, Mr. Zolnierek's efforts to coordinate the establishment of an agency-wide database tracking the compliance of telecommunications providers with statutes and regulations demonstrated only that he was charged with implementing policy changes, and not that he was the one actually formulating those policies. And Mr. Zolnierek's efforts to revise the ICC's telecommunications regulations in response to statutory changes were, according to the ALJ, merely responsive to policy changes dictated by statute.

¶ 85     The Board again disagreed, viewing Mr. Zolnierek's initiation of the telecommunications database project as a "broad-reaching solution" to a "systemic problem" faced by the Commission. The Board dismissed the ALJ's concerns that Mr. Zolnierek's e-mails, referring to "*our* proposed plan" (emphasis added) and actions "*we* have been taking" (emphasis added), cast doubt on his role in the project. In the Board's view, the fact that Mr. Zolnierek may have collaborated with others did not undermine the conclusion that he played a significant role in identifying the problem and formulating a solution. The Board was also persuaded by Mr. Zolnierek's proposals that staff hold informal workshops to address the effective use of low income assistance programs and that individual proceedings be conducted in which new market entrants would seek the Commission's approval to participate in a low income subsidy program. The Board reasoned that the Commission's acceptance of these recommendations, for projects of considerable magnitude, established that Mr. Zolnierek's recommendations were effective. Finally, the Board noted that the Union chose not to file an exception to the ALJ's finding that Mr. Zolnierek met the second part of the statutory definition because he implemented Commission policies.

¶ 86     On appeal, the Union focuses on Mr. Beyer's inability to name any policies that Mr. Zolnierek drafted on his own, criticizing the Board for relying on projects and policies that Mr. Zolnierek worked on with other Commission employees. As with Ms. Nicdao-Cuyugan, we reject this notion that managerial functions cannot also be collaborative ones. We have held that it is unimportant whether an employee functions as a manager independently or in collaboration with others, as "the [Labor Relations] Act does not require *** independence in management functions." *Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, 2011 IL App (4th) 090966, ¶ 187. Mr. Beyer's testimony makes clear that, in each instance relied on by the Board, Mr. Zolnierek either initiated the project in question or played a significant part in its development and implementation. The only other

argument the Union makes is one we have already rejected: that there is no indication in the record that those projects took up more than 50% of Mr. Zolnierek's time. The evidence presented established that Mr. Zolnierek initiated and was significantly involved in expansive projects affecting the operation of his division. On this record, we cannot conclude that the Board's finding that Mr. Zolnierek is engaged predominantly in executive and managerial functions was clearly erroneous.

¶ 87    We affirm the Board's finding that Mr. Zolnierek, the Director of Telecommunications, is a managerial employee excluded from collective bargaining.

¶ 88                                IV. CONCLUSION

¶ 89    As we have noted before, the "key inquiry" in cases interpreting the managerial exclusion in section 3(j) of the Labor Relations Act "is whether the duties and responsibilities of the employees in question are such that the employees should not be placed in a position requiring them to divide their loyalty between the employer and the collective bargaining unit." *Salaried Employees of North America (SENA) v. Illinois Local Labor Relations Board*, 202 Ill. App. 3d 1013, 1021 (1990). Based on the record as a whole, and affording the Board due discretion, we cannot say that any part of the Board's determination that the six Commission directors at issue in this case are managerial employees statutorily excluded from collective bargaining is clearly erroneous.

¶ 90    Affirmed.