# Illinois Official Reports

## Appellate Court

*American Federation of State, County & Municipal Employees (AFSCME), Council 31 v.*
*Illinois Labor Relations Board, State Panel,*
**2014 IL App (1st) 123426**

| | |
|---|---|
| Appellate Court Caption | AMERICAN FEDERATION OF STATE, COUNTY and MUNICIPAL EMPLOYEES (AFSCME), COUNCIL 31, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, and THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES (Illinois Commerce Commission), Respondents. |
| District & No. | First District, Third Division<br>Docket No. 1-12-3426 |
| Filed | August 13, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The decision of the Illinois Labor Relations Board finding that administrative law judges III and IV working at the Illinois Commerce Commission were managerial employees and were barred by the managerial employee exception in section 3(n) of the Illinois Public Labor Relations Act from engaging in collective bargaining was affirmed by the appellate court, since the Commission's policies on utility regulation are directly effectuated through the orders recommended by the administrative law judges and those orders are almost always adopted by the commissioners. |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, Nos. S-RC-10-034, S-RC-10-036. |
| Judgment | Affirmed. |

Counsel on
Appeal

Cornfield & Feldman LLC, of Chicago (Melissa J. Auerbach, of counsel), for petitioner.

Lisa Madigan, Attorney General (Michael A. Scodro, Solicitor General, and Sharon Purcell, Assistant Attorney General, of counsel), and Laner Muchin, Ltd. (Joseph M. Gagliardo and Lawrence Jay Weiner, Special Assistant Attorneys General, of counsel), both of Chicago, for respondents.

Panel

JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion.

**OPINION**

¶ 1    This case involves the application of the managerial employee exception codified in section 3(n) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(n) (West 2010)). The Illinois Labor Relations Board (Board) certified the American Federation of State, County and Municipal Employees, Council 31 (AFSCME), as the sole bargaining representative for eight administrative law judges (ALJs),[1] all of whom work at the Illinois Commerce Commission (Commission). The Department of Central Management Services (CMS) filed a petition in the appellate court seeking review of the Board's order certifying AFSCME as the exclusive representative of the eight ALJs. The appellate court reversed the Board's certification order and remanded the case to the Board for an evidentiary hearing to determine whether the subject ALJs III and IV are managerial employees. *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766 (4th Dist. 2010). On remand, the Board conducted a two-day evidentiary hearing and determined that the ALJs fell within the Act's definition for managerial employees. 5 ILCS 315/3(j) (West 2010).

¶ 2    We find that the evidence supports the Board's finding that ALJs III and IV fall within section 3(j), the Act's definition for managerial employees, and, therefore, the ALJs are barred by the managerial employee exception in section 3(n) of the Act from engaging in collective bargaining. Accordingly, we affirm the Board's decision.

¶ 3                                  BACKGROUND
¶ 4                                 The 2010 Appeal
¶ 5    On July 28, 2009, AFSCME filed two majority interest petitions with the Board seeking to be certified as the exclusive representative for eight ALJs (one ALJ IV and seven ALJ IIIs) of

---

[1]Only six ALJs participated in this appeal.

the Commission. In each of the petitions, AFSCME stated that there was an existing Board-certified collective bargaining unit and the ALJs wished to be included in the bargaining unit.

¶ 6 On August 14, 2009, CMS filed a position statement in response to AFSCME's petition, asserting that the ALJs should be excluded from the bargaining unit because they were "managerial" employees as defined by section 3(j) of the Act (5 ILCS 315/3(j) (West 2008)) and, as such, were ineligible to participate in collective bargaining.

¶ 7 On August 14, 2009, the ALJ assigned to the case sent a letter to the parties, stating that she had reviewed CMS's position statement and had found nothing therein necessitating a hearing. The ALJ ordered CMS to show cause why AFSCME should not be certified as the bargaining representative of the eight ALJs.

¶ 8 On September 9, 2009, in response to the Board's order to show cause, CMS filed a supplemental position statement and asserted that the ALJs had a direct hand in formulating policy through the preparation of orders for the Commission. According to CMS, the chief ALJ had estimated that the Commission adopted the ALJs' recommendations 95% of the time, that substantive modifications were rare, and outright reversals were even rarer.

¶ 9 After CMS submitted its supplemental position statement, the ALJ wrote the parties and stated that she found "no issues of law or fact in these matters" and that she would recommend that the Board's Executive Director certify AFSCME as the bargaining representative for the eight ALJs. On September 10, 2009, the Board's Executive Director certified AFSCME as the exclusive representative of the eight ALJs and ordered their inclusion in the existing RC-10 bargaining unit.

¶ 10 CMS filed a petition seeking a review of the Board's order in the Appellate Court, Fourth District, and argued that the ALJs were exempt from collective bargaining because they were managerial employees and that the Board erred when it certified AFSCME as the exclusive representative of the ALJs without holding an oral hearing.

¶ 11 The appellate court found that the ALJs were not managerial employees as a matter of law because members of the Commission retained the power and duty to issue their own decisions after receipt of the ALJs' recommended orders. *Department of Central Management Services*, 406 Ill. App. 3d at 782. The appellate court also found that the Board's decision to certify AFSCME as the exclusive representative for the ALJs without an oral hearing was clearly erroneous because there was still "a live question" as to whether the eight ALJs were managerial employees. *Department of Central Management Services*, 406 Ill. App. 3d at 767. Therefore, the appellate court remanded the case to the Board for further proceedings on whether the ALJs are managerial employees. *Department of Central Management Services*, 406 Ill. App. 3d at 783.

¶ 12                              The Evidentiary Hearing

¶ 13 On remand, the Board held an evidentiary hearing on January 18 and 19, 2012. The following is a summary of the relevant evidence presented at the hearing.

¶ 14                              The Commission's Structure

¶ 15 The testimony and exhibits revealed that there are five commissioners employed by the Commission and they have extensive expertise in utility regulation. The duties of the

Commission are defined by statute. The purpose of the Commission is to regulate public utilities, including gas, electricity, water, telephone and sewer. The Commission employs ALJs and assistants. The assistants may be attorneys, economists or analysts and they assist the commissioners with their review of the ALJs' recommendations. Each commissioner has at least one assistant. The Executive Director oversees the Commission's day-to-day operations. Mike Wallace is the chief ALJ and ALJ Glennon Dolan is the assistant director. At the evidentiary hearing, Wallace testified that there were five ALJ IIIs (Katina Baker, Bonita Benn, Ethan Kimbrel, Sonya Teague and Stephen Yoder) and one ALJ IV (John Riley).

¶ 16                                   Types of Cases

¶ 17        Between 2002 and 2012, the Commission decided approximately 775 cases,[2] divided into the following categories: 20 rate cases; 125 certificate cases; 125 consumer complaint cases; 40 negotiated agreement cases; 5 reorganization cases; 20 electric supplier act cases; 60 citation cases; 40 reconciliation cases; 60 gas miscellaneous cases; 60 electric miscellaneous cases; 30 water miscellaneous cases; 20 rulemaking cases; 120 confidentiality cases, and 50 miscellaneous cases. In addition to the aforementioned cases, Wallace testified that the Commission also hears approximately 10 to 15 new legislation cases each year. The Commission's orders on each case effectuate a Commission policy, though not every order announces a policy.

¶ 18        Wallace also testified that rate cases and cases arising from new legislation are the two main areas where the Commission formulates new policies. ALJs preside over rate cases where regulated utilities seek to increase the rates that they charge their customers. Rate cases involve creating new riders, which utilities use to collect revenue, determining rate design, and assessing the types of adjustments that must be made to the rate base. Wallace further testified that in hearing and deciding rate cases, the ALJs sometimes break new ground and advance "new scenario[s] for public utility regulation." In cases that arise from new legislation, the ALJs' recommendations assist the Commission in setting up new ways of procuring electricity.

¶ 19                              The Decision Making Pro
¶ 20                                  ALJ Decisions

¶ 21        The ALJs spend approximately 90% of their time conducting hearings and issuing recommendations on matters that arise under the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2010)) and other statutes administered by the Commission. "Employer exhibit[s]" 1 and 2 outline the duties of ALJ IIIs and IV and state, in part, that the ALJs are responsible for conducting "hearings in cases involving generic and rulemaking matters, rates, citations *** and all other matters, required under statutes affecting or administered by the Commission, including federal legislation, the Public Utilities Act and the Illinois Administrative Procedure Act." Exhibits 1 and 2 indicate that the ALJs must present recommended orders to the Commission for decisions, which requires developing and maintaining the requisite

---

[2]"[E]mployer exhibit 3" indicates that there were 755 cases. We counted the cases and there were 775 cases (excluding the 10 to 15 new legislation cases).

knowledge of other disciplines involved in regulation. Wallace testified that every ALJ order effectuates a Commission policy.

¶ 22 The ALJs do not have the power to dispose of a case and no case may be completed until the Commission enters a final order. However, Wallace testified that in telephone arbitration cases, where the commissioners fail to act on a case within a specified period of time, the ALJ's order automatically becomes the Commission's order.

¶ 23 The cases that come before the Commission may be contested or uncontested. In a contested case, the ALJ may schedule prehearing conferences, set hearings, examine pleadings, analyze issues, interrogate witnesses, rule on motions and on the admissibility of evidence, and otherwise manage the case. After the parties have submitted their evidence and briefed the relevant issues, the ALJ prepares an order containing his recommended disposition of the case. If the recommended disposition is adverse to any party, the order takes on the form of a proposed order. Each proposed order is reviewed by either Dolan or Wallace for scrivener's errors, but they are not reviewed substantively. The proposed order is then given to the parties, who may choose to file exceptions to the proposed order. The ALJ reviews the exceptions, replies and the parties' corresponding briefs and, if necessary, modifies the proposed order. The ALJ then issues the postexceptions proposed order. The order is then posted on the Commission's e-docket along with a memorandum explaining its salient points to the commissioners, and the full evidentiary record is also available on the Commission's e-docket.

¶ 24 In uncontested cases, the ALJs may hold evidentiary hearings. Some uncontested cases do not require a hearing if the parties settle or if a party fails to appear at the hearing. An uncontested case does not involve an adverse ruling. In uncontested cases, such as negotiated agreements, certificate and confidentiality cases, the ALJs often rely on the staff's expertise to make their recommendations to the commissioners. However, the ALJ is not required to accept the staff's recommendations and is expected to apply his/her own knowledge of the relevant discipline to the issue.

¶ 25 From 2009 through 2011, the subject ALJs III and IV drafted proposed orders in 82 of the 993 cases that they resolved.[3] The remaining 911 cases did not contain contested issues and therefore did not require a proposed order. Of the 82 proposed orders, the commissioners changed 3 and overturned 1. Wallace testified that in 99% of the cases, the commissioners agreed with the ALJs' dispositions.

¶ 26                                                    Commission Decisions
¶ 27 The commissioners generally meet three times each month to review the orders that the ALJs have posted to their e-docket. Prior to the meeting, each commissioner is provided with the ALJs' proposed orders and the accompanying memorandums for each case set for that meeting's agenda. In uncontested cases, the commissioners and their assistants review only the memorandums and the orders that the ALJs proffer. In contested cases, the commissioners review the parties' testimony, the ALJs' proposed orders and the memorandums. The commissioners do not have to accept the ALJs' findings of fact or legal conclusions.

---

[3]The cases for ALJ Riley were for the years 2010 and 2011 only.

¶ 28        In reviewing the ALJs' recommended orders, the commissioners may request the assistance of technical staff in nonroutine cases and sometimes send written questions to the ALJ assigned to the case. If the commissioners intend to make changes to an ALJ's order, they draft proposed language with their assistants and circulate it to the other commissioners' assistants. The assistants share the recommended changes with their commissioners and obtain their feedback. Once the commissioners have reached a consensus, the assistants draft language to reflect the commissioners' desired outcome. Wallace testified that the commissioners generally adopt the ALJs' "proposed" orders verbatim. However, if the commissioners revise an ALJ's order, the revised order is voted on by the commissioners. Once the commissioners rule on the ALJ's order, the order is designated a Commission order and served on the parties.

¶ 29                                The ALJ's Recommended Decision

¶ 30        The Board's ALJ found that (1) the subject ALJs are the "whole game" because they help run the agency by hearing and making recommendations on every type of case that comes before the Commission; (2) the ALJs' orders are the main avenue by which the Commission carries out its statutory duty to enforce laws related to public utilities; and (3) the ALJs predominantly perform management and executive functions, spending 90% of their time issuing recommendations through which they exercise independent judgment that broadly affects the Commission's goals. The ALJ also found that the ALJs' proposed orders in rate cases clearly qualify as managerial because they "innovate" rather than merely "nudge" the law in a particular direction within established standards.

¶ 31        Finally, the ALJ recommended that the subject ALJs III and IV be found to be managerial employees within the meaning of the Act and that the Board dismiss the petitions for representation.

¶ 32                                    The Board's Decision

¶ 33        The Board stated that the issue was whether the subject ALJs were managerial employees under the Act's traditional fact based test. The Board concluded that the ALJ's determination that the ALJs were managerial employees was supported by the evidence and consistent with the appellate court's analysis in *Department of Central Management Services*, 406 Ill. App. 3d at 778-79. Accordingly, the Board adopted the ALJ's recommended decision and dismissed the petitions for representation. This appeal followed.

¶ 34                                        ANALYSIS

¶ 35        In this appeal, we must determine whether the ALJs are managerial employees within the meaning of the Act. Judicial review of a board's decision is governed by the Administrative Review Law. 735 ILCS 5/3-102 (West 2010). The deference given to an agency's decision depends upon whether the question is one of fact, one of law, or a mixed question of fact and law. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006). The Board's findings of fact are given considerable deference, and they are subject to reversal only if they are against the manifest weight of the evidence. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009). While questions of law are reviewed *de novo*, mixed questions of fact and law are reviewed under the clearly erroneous

standard. *Kouzoukas*, 234 Ill. 2d at 463. Because this case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law, and the clearly erroneous standard of review applies. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). The supreme court has held that an administrative decision is clearly erroneous only where the reviewing court, based upon the entire record, is "left with the definite and firm conviction" that a mistake has been made. (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 36 AFSCME maintains that the ALJs are not managerial employees and therefore not excluded from collective bargaining. Employees of the state of Illinois have and are protected in the exercise of the right of self organization and may form, join or assist any labor organization to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment. 5 ILCS 315/6(a) (West 2010). The Act defines an employee as "any individual employed by a public employer, *** but excluding *** managerial employees." 5 ILCS 315/3(n) (West 2010). "Managerial employee" is defined as "an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2010). The exclusion is intended to maintain the distinction between management and labor and to provide the employer with undivided loyalty from its representatives in management. *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 339 (1997).

¶ 37 The Illinois courts employ two tests to determine whether an employee is a managerial employee for purposes of the Act: (1) "the traditional test, which considers whether the employee is a managerial employee as a matter of fact," and "(2) the alternative test, which considers whether the employee is a managerial employee as a matter of law." *Department of Central Management Services/The Department of Healthcare & Family Services v. Illinois Labor Relations Board, State Panel*, 388 Ill. App. 3d 319, 330 (2009). In the first appeal, the appellate court found that the ALJs were not managerial employees as a matter of law but remanded the case for further administrative proceedings to determine whether the ALJs are managerial employees. *Department of Central Management Services*, 406 Ill. App. 3d at 782-83. CMS did not appeal the appellate court's finding and, therefore, the appellate court's conclusion that the ALJs were not managerial employees as a matter of law became the law of the case. See *In re Christopher K.*, 217 Ill. 2d 348, 365 (2005). Accordingly, we can only consider the traditional test to determine whether the facts presented at the evidentiary hearing support the Board's finding that the ALJs in question are managerial employees as a matter of fact.

¶ 38 The traditional test considers the facts to determine whether an employee comes within the purview of the definition of a managerial employee in section 3(j) of the Act. Although the Act does not define "executive and management functions," we note that these functions amount to running an agency or department, such as by establishing policies and procedures, preparing the budget, or otherwise assuring the agency or department operates effectively. *Department of Central Management Services*, 406 Ill. App. 3d at 774. However, the managerial exclusion is not limited to employees who have the potential to affect labor relations matters, such as wages, hours, and other terms and conditions of employment. *Board of Regents of the Regency Universities System v. Illinois Educational Labor Relations Board*, 166 Ill. App. 3d 730,

740-41 (1988). "The employee must possess and exercise authority and discretion which broadly effects a department's goals and means of achieving its goals." *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 87 (1996).

¶ 39　　A managerial employee not only has the authority to make policy but also bears the responsibility of effectuating that policy. *Department of Central Management Services*, 406 Ill. App. 3d at 774-75. In other words, managerial employees do not merely recommend policies or give advice to those higher up the employment chain, they actually direct the governmental enterprise in a hands-on way. *Department of Central Management Services*, 406 Ill. App. 3d at 775. Managerial employees are those involved in the direction of the governmental enterprise or a major unit thereof, and who possess authority to broadly affect its mission or fundamental methods. *Salaried Employees of North America (SENA) v. Illinois Local Labor Relations Board*, 202 Ill. App. 3d 1013, 1020 (1990).

¶ 40　　If the employee's role is advisory and subordinate, the employee is not a managerial employee. *Department of Central Management Services*, 278 Ill. App. 3d at 87. However, as explained in *Chief Judge*, " 'the relevant consideration is effective recommendation or control rather than final authority' over employer policy." *Chief Judge*, 178 Ill. 2d at 339-40 (quoting *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672, 683 n.17 (1980)). As such, an advisory employee who makes effective recommendations can be managerial. See *Chief Judge*, 178 Ill. 2d at 339-40. To be effective means to produce a decided, decisive or desired effect. *Department of Central Management Services*, 406 Ill. App. 3d at 775. Therefore, recommendations are effective if they are almost always implemented or followed. *Department of Central Management Services/Pollution Control Board v. Illinois Labor Relations Board, State Panel*, 2013 IL App (4th) 110877, ¶ 26; *Department of Central Management Services*, 406 Ill. App. 3d at 775.

¶ 41　　Our supreme court explained in *Chief Judge* that the managerial exclusion in the Act was adopted from decisions of the National Labor Relations Board and the United States Supreme Court. *Chief Judge*, 178 Ill. 2d at 339. The *Chief Judge* court held that the definition of managerial employee in section 3(j) of the Act is very similar to the exclusion for managerial employee the Supreme Court read into the National Labor Relations Act (29 U.S.C. § 151 *et seq.* (1994)) in *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672 (1980). *Chief Judge*, 178 Ill. 2d at 339. In addition, the *Chief Judge* court made it clear that the concept of effective recommendations, which the Supreme Court held to be applicable to the managerial exclusion in *Yeshiva*, applies with equal force to the managerial exclusion under the Illinois statute. See *Chief Judge*, 178 Ill. 2d at 339-40.

¶ 42　　In *Yeshiva*, the union filed a petition to represent the faculty members of a university by arguing that the faculty's authority was merely advisory. The *Yeshiva* Court explained that a managerial employee recommends discretionary actions that effectively control or implement employer policy. *Yeshiva*, 444 U.S. at 683. The *Yeshiva* Court found that the faculty at each school made recommendations to the dean or director in every case of faculty hiring, tenure, sabbaticals, termination and promotion. And although the final decision was reached by the central administration on the advice of the dean or director, the overwhelming majority of the faculty recommendations were implemented. *Yeshiva*, 444 U.S. at 677. The Supreme Court noted that the fact the administration held a rarely exercised veto power did not diminish the faculty's effective power in policymaking and implementation. *Yeshiva*, 444 U.S. at 683 n.17. Accordingly, the *Yeshiva* Court held that the faculty members were managerial employees and

therefore excluded from collective bargaining under the National Labor Relations Act. *Yeshiva*, 444 U.S. at 682, 686.

¶ 43    The duties of the Commission are set forth in sections 4-101 and 4-201 of the Public Utilities Act. 220 ILCS 5/4-101, 4-201 (West 2010). Section 4-101 provides "[t]he Commerce Commission shall have general supervision of all public utilities." 220 ILCS 5/4-101 (West 2010). Section 4-201 makes it "the duty of the Commission to see that the provisions of the Constitution and statutes of this State affecting public utilities *** are enforced and obeyed." 220 ILCS 5/4-201 (West 2010). The functions of the ALJs III and IV are outlined in CMS' Exhibits 1 and 2, which provide that the ALJs are responsible for conducting "hearings in cases involving generic and rulemaking matters, rates, citations *** and all other matters, required under statutes affecting or administered by the Commission, including federal legislation, the Public Utilities Act and the Illinois Administrative Procedure Act." The ALJs assist the commissioners with their recommended orders and the commissioners review and approve the recommended orders drafted by the ALJs. The evidence establishes that the ALJs have a prominent role in the fulfillment of the Commission's duties and are the "whole game" with regard to the agency's mission. Therefore, when we compare the job functions of the ALJs to the overall mission of the Commission, and when we consider that the ALJs are the whole game when it comes to utility regulation–just as the faculty members in *Yeshiva* were the whole game when it came to academic policy–we find that the ALJs are managerial employees. See *Yeshiva*, 444 U.S. at 682-86; *Chief Judge*, 178 Ill. 2d at 339-47.

¶ 44    We also note that although the ALJs' recommended orders are reviewed by the commissioners and their assistants, the review does not diminish the ALJs' effective power in directing the effectuation of the Commission's policies and practices. See *Yeshiva*, 444 U.S. at 683 n.17. The test is not the presence or absence of review. *Department of Central Management Services*, 406 Ill. App. 3d at 777. Rather, the test is the effectiveness, power, or influence of the recommendations. *Department of Central Management Services*, 406 Ill. App. 3d at 777. The determining factor is the influence of the recommendations and whether they almost always persuade the superiors. See *Yeshiva*, 444 U.S. at 677.

¶ 45    Here, CMS maintains that the Commission rarely makes any substantive modification of the ALJs' recommended orders and that outright reversals are even rarer. Wallace testified that the Commission adopts the ALJs' recommendations 99% of the time. Specifically, the ALJs at issue wrote 82 proposed orders between 2009 and 2011 and the commissioners accepted all but 1 order and only 3 orders were amended. Like the faculty members in *Yeshiva*, the ALJs issue recommended orders in every case that comes before the Commission relating to public utilities and, although the final decision is reached by the commissioners on the advice of their assistants, the overwhelming majority of the ALJs' recommended orders are implemented. *Yeshiva*, 444 U.S. at 677.

¶ 46    As this court noted in *Department of Central Management Services*, the procedure by which the ALJs hold hearings and issue recommended orders, which the Commission adopts almost all the time, is the primary means, if not the exclusive means by which the Commission fulfills its statutory mandate of regulating public utilities. *Department of Central Management Services*, 406 Ill. App. 3d at 779. Therefore, the ALJs, through the issuance of their recommended orders, are engaged predominantly in executive and managerial functions and are charged with directing the effectuation of management policies and practices within the purview of section 3(j) of the Act because the commissioners (1) almost always accept the

- 9 -

ALJs' recommended orders, and (2) make and implement policy through the issuance of orders which are recommended by the ALJs. *Yeshiva*, 444 U.S. at 682, 686; *Chief Judge*, 178 Ill. 2d at 339-47.

¶ 47 AFSCME contends that although the ALJs are involved in carrying out the existing policies of the Commission, they neither formulate policy nor direct the effectuation of policy. But, it is not absolutely necessary that a managerial employee formulate policy. *Department of Central Management Services*, 406 Ill. App. 3d at 780. "Formulating policy is merely one example of running an agency." *Department of Central Management Services*, 406 Ill. App. 3d at 780. Running a department might not entail the creation of new policies, but it will always entail directing the effectuation of existing policies. *Department of Central Management Services*, 406 Ill. App. 3d at 780. We note that Wallace testified that formulating policy is not a major part of the Commission's function, but that the Commission's orders always direct the effectuation of its existing policies. The evidence shows that the ALJs help formulate policy through their recommended orders in rate cases and in cases that arise from new legislation. Because the ALJs' recommended orders assist the commissioners, it logically follows that the ALJs assist the commissioners in formulating policy. Therefore, because the Commission almost always adopts the ALJs' recommended orders, the ALJs direct the effectuation of the State's policies regarding public utilities.

¶ 48 AFSCME relies on the Act's definition of "professional employee," which provides: " '[p]rofessional employee' means any employee engaged in work predominantly intellectual and varied in character rather than routine mental, manual, mechanical or physical work; involving the consistent exercise of discretion and adjustment in its performance." 5 ILCS 315/3(m) (West 2010). AFSCME also contends that the Act includes professional employees in the class of employees entitled to collective bargaining rights. Here, although the Board could have concluded that ALJs III and IV fit within this definition, it did not, and we would be substituting our judgment for that of the Board to reverse on that basis. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) (a reviewing court should not substitute its judgment or reweigh the evidence in reviewing an agency's factual findings).

¶ 49 After a review of the record, we find that we are not left with a definitive and firm conviction that the Board's decision was clearly erroneous. Therefore, we hold that the evidence supports the Board's finding that the ALJs are managerial employees as defined by section 3(j) of the Act and are barred by the managerial employee exception in section 3(n) of the Act from engaging in collective bargaining.

¶ 50                                            CONCLUSION

¶ 51 We find that the ALJs direct the effectuation of the Commission's policies on utility regulation through their recommended orders and that the commissioners almost always adopt the ALJs' recommended orders. Therefore, we hold that the ALJs are managerial employees as defined by section 3(j) of the Act and are barred by the managerial exception in section 3(n) of the Act from engaging in collective bargaining. Accordingly, the Board's order finding that the ALJs were managerial employees was not clearly erroneous.

¶ 52 Affirmed.