2019 IL App (1st) 181685

Fourth Division
June 27, 2019

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31,<br><br>    Petitioner,<br><br>v.<br><br>THE ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL, and THE CITY OF CHICAGO,<br><br>    Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Petition for Review of the Decision and Order of the Illinois Labor Relations Board, Local Panel.<br><br>No. L-RC-16-031 |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant dispute comes to this court on direct administrative review of the decision and order of the Illinois Labor Relations Board, Local Panel (Board). Petitioner American Federation of State, County and Municipal Employees, Council 31 (union), filed a petition to add 16 City of Chicago (City) employees to its existing bargaining unit, and the City objected, claiming these employees, who all held the title of "Senior Procurement Specialist" with the City's department of procurement services (department), were managerial and therefore ineligible to join the union. After a hearing, an administrative law judge (ALJ)

issued a recommended decision and order, agreeing with the City's position that these employees were managerial, and the Board adopted the ALJ's recommendation. The union appeals and, for the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3       On June 3, 2016, the union filed a representation/certification petition with the Board, seeking to add 16 employees with the title of "Senior Procurement Specialist" to its existing bargaining unit. On June 30, 2016, the City objected to the union's petition, claiming that the employees were managerial employees under section 3(j) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(j) (West 2014)) and were therefore excluded from the ability to engage in collective bargaining. The parties proceeded to a hearing before an ALJ, where Byron Whittaker, a deputy procurement officer with the department, was the sole witness. As the department's duties are largely statutory, it is helpful to first explain the statutory framework of the department, followed by a discussion of Whittaker's testimony and the decisions of the ALJ and Board.

¶ 4                                  I. Statutory Duties

¶ 5       The department is governed by the Municipal Purchasing Act for Cities of 500,000 or More Population (Purchasing Act) (65 ILCS 5/8-10-1 *et seq.* (West 2014)), and chapter 2-92 of the Municipal Code of Chicago (Municipal Code) (Chicago Municipal Code ch. 2-92). Under the Purchasing Act, all purchase orders or contracts exceeding $10,000 are required to be awarded through a free and open competitive bidding process, in which the contract is to be awarded to the "lowest responsible bidder." 65 ILCS 5/8-10-3(a) (West 2014). Certain types of contracts are not subject to this bidding process, such as contracts for professional services, single-source goods or services, utility services, publications, and certain printing

and binding orders. 65 ILCS 5/8-10-4 (West 2014). The City has designated a chief procurement officer to head the department and to be responsible for developing and implementing department procurement plans pursuant to the Purchasing Act. Chicago Municipal Code § 2-92-010 (amended Apr. 15, 2015); see 65 ILCS 5/8-10-15 (West 2014) (providing for a purchasing agent to be designated in each municipality subject to the Purchasing Act).

¶ 6     With respect to contracts subject to the competitive bidding process, proposals for such contracts must be advertised in a local newspaper for at least 10 days. 65 ILCS 5/8-10-7 (West 2014). The advertisement must set forth the date, time, and place assigned for the opening of the bids and must describe the character of the proposed contract in sufficient detail to enable bidders to know what their obligations will be. 65 ILCS 5/8-10-7 (West 2014).

¶ 7     After the advertising period, the chief procurement officer awards the contract to the lowest responsible bidder. 65 ILCS 5/8-10-10 (West 2014). Under the Purchasing Act, "[i]n determining the responsibility of any bidder the [chief procurement officer] may take into account other factors in addition to financial responsibility, such as past records of transactions with the bidder, experience, adequacy of equipment, ability to complete performance within a specified time limit and other pertinent considerations." 65 ILCS 5/8-10-11 (West 2014). Additionally, "[a]ny and all bids received in response to an advertisement may be rejected by the [chief procurement officer] if the bidder is not deemed responsible, or the character or quality of the services, supplies, materials, equipment or labor does not conform to requirements or if the public interest may otherwise be served thereby." 65 ILCS 5/8-10-12 (West 2014). The Municipal Code includes additional considerations,

such as bid incentives and bid preferences for certain types of bidders (see, *e.g.*, Chicago Municipal Code § 2-92-405 (added Apr. 15, 2015), § 2-92-407 (added June 27, 2018), § 2-92-410 (amended Apr. 15, 2015), § 2-92-940 (added June 28, 2017)), as well as contract requirements for minority-owned and women-owned businesses (see Chicago Municipal Code § 2-92-430 (amended July 19, 2000)) and City and project-area residents (see Chicago Municipal Code § 2-92-330 (amended Apr. 10, 2013)).

¶ 8     With respect to contracts not subject to the competitive bidding process, the department prequalifies certain contractors pursuant to a "request for qualifications" (RFQ), which results in a list of "exclusive responsible bidders" for projects concerning roof repair, building demolition, board-up work, or emergency bridge or viaduct repair.[1] Chicago Municipal Code § 2-92-340 (amended Apr. 18, 2018). The responsible bidder list for each RFQ is compiled by an evaluation committee designated by the chief procurement officer, which includes members of the departments likely to require the type of work addressed by the RFQ. Chicago Municipal Code § 2-92-350 (amended July 19, 2000). The evaluation committee evaluates responses to the RFQ in accordance with the criteria set forth in the RFQ and recommends to the chief procurement officer those contractors satisfying the criteria. Chicago Municipal Code § 2-92-350 (amended July 19, 2000). Based on these recommendations, the chief procurement officer develops a list of contractors who are prequalified as the exclusive responsible bidders on contracts for the type of work addressed in the RFQ. Chicago Municipal Code § 2-92-350 (amended July 19, 2000). If the chief procurement officer determines at any time that the contractor is "nonresponsible," the chief

---

[1]As explained in more detail when discussing Whittaker's testimony, the department uses the RFQ process more broadly than the way in which it is described in the Municipal Code, to apply to professional services in addition to architectural and engineering services. As noted, contracts for professional services are not subject to the competitive bidding requirement under the Purchasing Act. 65 ILCS 5/8-10-4 (West 2014).

procurement officer may delete the contractor from the responsible bidder list. Chicago Municipal Code § 2-92-350 (amended July 19, 2000).

¶ 9                                    II. Whittaker's Testimony

¶ 10        As noted, the sole witness at the hearing on the union's petition was Byron Whittaker, a deputy procurement officer with the department, who testified that he has been working in that capacity for 7 to 8 years and has been an employee within the department for 30 years. Whittaker testified that as a deputy procurement officer, his responsibility was to provide direction and supervision to a staff of procurement specialists and senior procurement specialists. Whittaker testified that he was responsible for overseeing several units of the department: the architectural and engineering unit; the construction unit; and the commodities unit, which also included the small orders unit. Whittaker testified that the department was a "service department" and that their "client departments" were all of the City's user departments. The client departments requisitioned the department for various goods and services required for their day-to-day functions and operations, and the department worked with the client department to develop specification documents for the purpose of preparing either bid documents or solicitation documents that detailed the goods and services required.

¶ 11        Whittaker testified that, as to the procedural steps in the procurement process, the client department would first enter a requisition request into the computerized system and the department would determine whether a competitive process or an evaluative process was required. Then, the department would work with the client department to develop a detailed specification document, with the client department being primarily responsible for setting forth the scope of services that it wished the department to procure. After that document was

developed, the department "will then pretty much take over the process," including soliciting bids, receiving the bids, and either performing a bid tabulation or leading a committee evaluation process.

¶ 12     Whittaker testified to the organizational structure of the department, which was depicted in an organizational chart that was admitted into evidence at the hearing. Under the chart, the chief procurement officer was the head of the department. Directly under him was the first deputy procurement officer, followed by deputy procurement officers in six divisions. Three of these divisions were grouped into the "Contract Administration" section: (1) the construction, architectural and engineering, commodities, and small orders division; (2) the work services, heavy equipment, and "pro-serve" division; and (3) the aviation division. Under the deputy procurement officer in each division there is an assistant procurement officer, followed by senior procurement specialists and procurement specialists.

¶ 13     Whittaker testified that, with respect to the division under his control, the construction, commodities, and small orders units generally employed competitive bidding. Under that process, the department worked with the client department to develop a detailed specification of the services required by the client department, resulting in the development of a specification document. The specification document would be prepared for solicitation by either the senior procurement specialist or a procurement specialist, who would then receive and review the bids, perform bid tabulations, and work with the client department to recommend a bid award. The department would then award the bid and secure the contract documents, so that the service could be performed or the product could be obtained.

¶ 14     With respect to the architectural and engineering unit, Whittaker testified that this unit was considered a "professional service unit" and participated in a "more evaluative process"

that involved either a RFQ or request for proposals (RFP). As with the other units, this process began with gathering documents from the client department concerning the scope of the services required. After that, an evaluation committee was established for the purpose of identifying the appropriate evaluation criteria; this evaluation committee was always chaired by a procurement specialist. The committee then received responses to its solicitation documents and made a recommendation to the client department's commissioner, who, in turn, made a recommendation to the chief procurement officer.

¶ 15    Whittaker testified that the department maintained a "department of service tool kit," which was a reference guide for the department's staff, as well as the client departments; the guide was admitted into evidence at the hearing. The purpose of the guide was to provide a "standard operating procedure type document," so that new staff and the client departments would understand the procurement process. With respect to the differences between the RFP and RFQ processes, the guide explained that the RFP was a solicitation issued when competitive bidding was not practicable or advantageous to the City and "where price is a factor, but not the only factor, such as when the degree of professional skill of an individual or firm plays an important part." The proposals would be submitted to the evaluation committee and the contract award was based on "the best qualified firm(s) submitting the proposal most advantageous to the City, taking into consideration all of the evaluation criteria." The RFQ was a "qualification-based solicitation that requests the submittal of technical and professional qualifications" and was used to select the individuals or firms most qualified to provide technical expertise. RFQs would be issued for architectural and engineering services, as well as other professional services such as financial services, auditing, accounting, medical services, information technology consulting and software

development and maintenance, management consulting, legislative consulting, and property management. An evaluation committee selected the individuals or firms most qualified, taking into account all of the criteria stated in the RFQ. The firm or individual could then become part of a prequalified vendor pool and be eligible to receive task orders periodically issued by the City for individual projects.

¶ 16    With respect to the specific duties of the senior procurement specialists, Whittaker testified to the job description of the role, which was contained in a document that was admitted into evidence at the hearing. According to the document, the "essential duties" of the senior procurement specialist were to review and clarify specifications submitted by operating departments to ensure completeness and compliance with the City's procurement standards, to review checklists compiled by staff in user departments and complete designated portions of those checklists, to verify the validity of supplemental documentation, to advise and provide technical assistance to operating departments regarding the City's procurement processes, to prepare documentation for the advertisement and solicitation of bids, to evaluate vendor bids for responsiveness to contract specifications, to calculate bid tabulations and make recommendations for the selection of the lowest bidder, to review and approve contract modifications and to prepare addendums to notify prospective bidders of changes, to schedule and facilitate pre-bid and post-bid conferences to review the contract scope and respond to participant questions, to participate in and facilitate evaluation committees to review submitted proposals in response to RFPs and RFQs and to interview potential vendors, and to maintain copes of contract documentation for imaging and recordkeeping purposes.

¶ 17    Whittaker also testified to the senior procurement specialist's role in the procurement process. With respect to competitive bids, the senior procurement specialist worked with the client department to ensure that the specification document contained all of the necessary criteria for the service being solicited, as well as ensuring that the document was compliant with the law. Whittaker testified that the department had templates to be used for invitations to bid, but that it was the senior procurement specialist's duty to select the correct template and to ensure that the solicitation document was accurate and complete. Whittaker testified that the senior procurement specialist could not substantively modify the template itself, but could work with the client department in ensuring that the specifications set forth in that template were appropriate. In developing the specifications, the senior procurement specialist worked with the client department to ensure that the request for services or goods was clear and that there were no proprietary issues or issues such that the document itself "doesn't lend itself to be directed or solicited towards one firm or one manufacturer." However, the senior procurement specialist was not involved in negotiating prices between the client and a vendor during the bidding process.

¶ 18    The senior procurement specialist would engage in a "back-and-forth" with the client department in revising the bid document and, once the document was ready, would coordinate the publishing of the bid document; the senior procurement specialist had no discretion to choose the newspaper in which the requests for bids were published. The solicitation period was generally between 10 and 30 days, and then the senior procurement specialist would open the bids and tabulate and review each bid. This involved determining the "apparent" low bidder, as well as a determination that the apparent low bidder was a responsible bidder as required by the Purchasing Act and Municipal Code. Whittaker

testified that "there is some judgment involved in terms of evaluating the documents and the information" in determining whether a bidder was a responsible bidder. Whittaker estimated that, in determining whether a bidder was a responsible, there were 20 to 30 factors that were used to make that determination. After the senior procurement specialist had identified the lowest responsible bidder, the recommendation would be forwarded to the manager. Whittaker testified that he agreed with the senior procurement specialist's recommendation "[p]retty much *** all the time." The chief procurement officer would then sign off on the recommendation, and the recommendation would then be forwarded to the client department, which responded as to whether it wanted to move forward with the award.

¶ 19    With respect to the RFP and RFQ processes, Whittaker testified that, as with the competitive bidding process, the senior procurement specialist worked with the client department on a specification document and would be responsible for advertising and receiving the bids. However, the senior procurement specialist also worked with the client department to determine the composition of the evaluation committee. The committee would include representatives from the client department and other subject matter experts that they chose to add to the committee; the committee also always included the senior procurement specialist, who would chair the committee as a nonvoting member. Once the responses to the publication arrived, the senior procurement specialist would ensure that each member of the committee signed a confidentiality agreement and would then distribute the responses. Once the evaluation committee has had the opportunity to evaluate each of the responses based on the evaluation criteria, the committee made recommendations for the selection of certain firms, which would be forwarded to the client department's commissioner, followed by the chief procurement officer. Once the RFP or RFQ was approved, the senior procurement

specialist would be responsible for coordinating the processing of a contract with the selected firm.

¶ 20　　Whittaker testified that there were occasions in which senior procurement specialists were involved in recommending changes to department policy. He provided the example of a senior procurement specialist in the demolition area, where the unique requirements of that area resulted in the senior procurement specialist augmenting the way that these requests were processed.

¶ 21　　　　　　　　　　III. ALJ and Board Decisions

¶ 22　　On February 8, 2018, the ALJ[2] issued a recommended decision and order, finding that the senior procurement specialists were managerial employees under the Act. The ALJ found that senior procurement specialists were engaged in executive and management functions and assisted in running the department because they were "broadly involved" in the procurement process. The ALJ found that the department accomplishes its mission through the senior procurement specialists, "who are responsible for administering the procurement process from start to finish." The ALJ noted that under the Purchasing Act and the Municipal Code, the chief procurement officer had the sole authority to bind the City to contracts for goods and services and "[t]he evidence here is that he does so in reliance on the recommendations of the [senior procurement specialist] employees who are responsible for conducting the competitive bidding, RFP, and RFQ processes when a user department identifies a requisition need." The ALJ found that the evidence demonstrated that, with respect to the competitive bidding process, the senior procurement specialists determined whether the lowest bidder was also the lowest responsive and responsible bidder and should be awarded the contract

---

[2] The ALJ who issued the recommended decision and order was a different ALJ than the one who presided over the hearing.

and that they made recommendations regarding the lowest responsible bidder, "which the Chief Procurement Officer almost always accepts."

¶ 23    The ALJ found unpersuasive the union's argument that the employees were not managerial because the procurement process was largely restricted by statutes and guidelines. The ALJ found that the existence of statutory requirements "does not, of itself, mean that the [senior procurement specialist] employees cannot be managers within the meaning of section 3(j)." The ALJ noted that the senior procurement specialists "are responsible for the procurement process from the beginning, when a user department submits a requisition to the Department, until the end of the process, when a contract for the requisition is completed." The ALJ further found that the Purchasing Act and the Municipal Code "require employees in the [senior procurement specialist] position to exercise discretion in ascertaining whether a bidder is the lowest responsible bidder." The ALJ found that, to determine if the lowest bidder is also the lowest responsible bidder, the senior procurement specialist is required to consider a number of factors, noting that Whittaker testified that a senior procurement specialist may consider approximately 30 factors to determine the lowest responsible bidder. The ALJ also noted that "the record does not indicate that the [senior procurement specialist] employees are told how much weight to give to each of the factors separately or in relation to each other. Although [the union] insists that the [senior procurement specialist's] duties consist of little more than checking boxes and collecting documents, nothing in the record suggests that City contracts are awarded through the rote process [the union] describes."

¶ 24    The ALJ cited several cases in noting that it was "well-established" that a public body exercises a great deal of discretion in determining the lowest responsible bidder. The ALJ found that the department "exercises its discretionary power granted under the laws through

its [senior procurement specialist] employees who are tasked with administering the procurement process." Thus, the ALJ found that the senior procurement specialists were engaged in executive and management functions.

¶ 25    The ALJ also found that the senior procurement specialists directed the effectuation of the department's policies. The ALJ found that the procurement process generally culminated in a recommendation by the senior procurement specialist, and Whittaker's uncontroverted testimony established that the "the Chief Procurement Officer almost always accepts the recommendation." Thus, the recommendations of the senior procurement specialist "almost always result in procurement contracts awarded as determined by the [senior procurement specialist]." Accordingly, the ALJ found that "the [senior procurement specialist] employees make effective recommendations." Therefore, since the ALJ found that the senior procurement specialists were managerial employees under the Act, they were ineligible to be included in the bargaining unit, and the ALJ recommended that the union's petition be denied.

¶ 26    The union filed a number of exceptions to the ALJ's recommended decision and order. As relevant to the instant appeal, the union claimed that the ALJ failed to hold the City to its burden of proof in establishing that the senior procurement specialists exercised the significant discretion required of a managerial employee because the ALJ did not require the City to establish how the various factors considered in awarding a contract were weighted. The union also claimed that the ALJ improperly relied on case law suggesting that the determination of who is the lowest responsible bidder involves a great deal of discretion to "fill[ ] the gaps in the record."

¶ 27    On July 10, 2018, the Board issued its decision and order, accepting the ALJ's recommendation and denying the union's petition. This appeal follows.

¶ 28    ANALYSIS

¶ 29    On appeal, the union claims that the Board erred in finding that senior procurement specialists are managerial employees (1) because the ALJ improperly eased the City's burden of proof by not requiring specific evidence as to how each factor was weighted in determining the lowest responsible bidder and (2) because the ALJ improperly used case law to "bridge the gap in the record" and find that the determination of the lowest responsible bidder involved a great deal of discretion.

¶ 30    This matter comes to us on direct appellate review pursuant to section 9(i) of the Act, which permits direct appeals to the appellate court of an order of the Board dismissing a representation petition. 5 ILCS 315/9(i) (West 2014); *Health & Hospital System v. Illinois Labor Relations Board, Local Panel*, 2015 IL App (1st) 150794, ¶ 49. Our review is governed by the Illinois Administrative Review Law, which provides that our review "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2014); 5 ILCS 315/9(i) (West 2014) (Administrative Review Law applies to judicial review of Board decisions). The standard of review, which determines the degree of deference given to the agency's decision, turns on whether the issue presented is a question of law, a question of fact, or a mixed question of law and fact. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142 (2006).

¶ 31    An agency's conclusion on a question of law is reviewed *de novo*. *Schiller*, 221 Ill. 2d at 142. However, while the reviewing court is not bound by the agency's interpretation of a statute, such an interpretation remains relevant where there is a reasonable debate about the

meaning of the statute. *Schiller*, 221 Ill. 2d at 142. An agency's conclusion on a question of fact is afforded more deference. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471 (2005). "The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2014). The reviewing court does not reweigh the evidence before the agency, but simply determines whether the agency's decision is against the manifest weight of the evidence. *Comprehensive Community Solutions*, 216 Ill. 2d at 471-72.

¶ 32    Finally, a mixed question of law and fact asks the legal effect of a given set of facts. *Schiller*, 221 Ill. 2d at 143. "That is, in resolving a mixed question of law and fact, a reviewing court must determine whether established facts satisfy applicable legal rules." *Schiller*, 221 Ill. 2d at 143. The agency's conclusion on a mixed question of law and fact is reviewed for clear error, which is "significantly deferential to an agency's experience in construing and applying the statutes that it administers." *Schiller*, 221 Ill. 2d at 143. "Thus, when the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Schiller*, 221 Ill. 2d at 143. In the case at bar, the parties agree that the question of whether the senior procurement specialists are considered "managerial" under the Act is a mixed question of fact and law subject to the "clearly erroneous" standard of review. See *American Federation of State, County & Municipal Employees, Council 31 v. State*, 2018 IL App (1st) 140656, ¶ 26 (reviewing the question of whether employees are managerial under "clearly erroneous" standard); *American Federation of State, County, & Municipal Employees (AFSCME), Council 31 v.*

*State*, 2014 IL App (1st) 130655, ¶ 23 (same); *County of Cook v. Illinois Labor Relations Board—Local Panel*, 351 Ill. App. 3d 379, 385 (2004) (same).

¶ 33    Under the Act, with certain exceptions, "public employees" have the right to self-organize and may join labor organizations for purposes of collective bargaining. 5 ILCS 315/6(a) (West 2014). The Act defines a "public employee" as "any individual employed by a public employer *** but excluding *** managerial employees." 5 ILCS 315/3(n) (West 2014). "The exclusion is intended to maintain the distinction between management and labor and to provide the employer with undivided loyalty from its representatives in management." *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 339 (1997).

¶ 34    The Act defines a " '[m]anagerial employee' " as

> "an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2014).

Thus, the Act sets forth a two-part test to determine if an individual is a managerial employee: "[t]he person must be both (1) 'engaged predominantly in executive and management functions' and (2) 'charged with the responsibility of directing the effectuation of management policies and practices.' " *American Federation of State, County & Municipal Employees, Council 31*, 2018 IL App (1st) 140656, ¶ 17 (quoting 5 ILCS 315/3(j) (West 2010)). "The first part of the test relates to *what* an employee does, *i.e.*, 'executive and management functions.' " (Emphasis in original.) *American Federation of State, County, & Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 130655, ¶ 20 (quoting *Department of Central Management Services/Pollution Control Board v. Illinois Labor*

*Relations Board, State Panel*, 2013 IL App (4th) 110877, ¶ 25). "The second part of the test relates to *who* is responsible for the running of the department; that is, to be managerial, an employee must not merely have the authority to make policy but also bear[ ] the responsibility of making that policy happen." (Emphasis in original and internal quotation marks omitted.) *American Federation of State, County, & Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 130655, ¶ 20.

¶ 35    In the case at bar, the Board determined that the senior procurement specialists satisfied both prongs of this test. First, the Board adopted the ALJ's recommendations and found that the senior procurement specialists were engaged predominantly in executive and management functions. " '[E]xecutive and management functions specifically relate to the running of the agency or department, including the establishment of policies and procedures, preparation of the budget, and responsibility that the agency or department operates effectively and efficiently.' " *County of Cook*, 351 Ill. App. 3d at 386 (quoting *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 87 (1996)). Other management functions include "using independent discretion to make policy decisions, changing the focus of an employer's organization, being responsible for day-to-day operations, and negotiating on behalf of an employer with its employees or the public." *Secretary of State v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 111075, ¶ 122.

¶ 36    Managerial status is not limited to those at the highest level of the governmental entity; "it is enough if the functions performed by the employee sufficiently align him with management such that the employees should not be in a position requiring them to divide their loyalty to the administration *** with their loyalty to an exclusive collective-bargaining

representative." (Internal quotation marks omitted.) *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 301 (1995). However, an employee is not a managerial employee simply because he or she exercises professional discretion and technical expertise or performs duties that are essential to the employer's ability to accomplish its mission. *American Federation of State, County & Municipal Employees, Council 31*, 2018 IL App (1st) 140656, ¶ 18. "Managerial employees 'possess and exercise authority and discretion which broadly effects [*sic*] a department's goals and means of achieving its goals.' " *American Federation of State, County & Municipal Employees, Council 31*, 2018 IL App (1st) 140656, ¶ 18 (quoting *County of Cook*, 351 Ill. App. 3d at 386). "The authority to make independent decisions and the consequent alignment of the employee's interests with management's are hallmarks of managerial status for purposes of labor law." *Office of the Cook County State's Attorney*, 166 Ill. 2d at 301.

¶ 37    In the case at bar, the union points to two issues that it claims render the Board's decision clearly erroneous. First, the union claims that the Board eased the City's burden of proof by failing to require the City to provide specific evidence concerning the weighing of factors in the procurement process. Second, the union claims that the ALJ improperly relied on case law to establish that determining the lowest responsible bidder was a discretionary decision. We do not find either of the union's arguments persuasive.

¶ 38    The parties agree that, as the party seeking to exclude the senior procurement specialists from the bargaining unit, the City carried the burden of proving their managerial status by a preponderance of the evidence. See *Secretary of State*, 2012 IL App (4th) 111075, ¶ 55. To do so, the City was required to present specific evidence as to each employee and connect that evidence to the controlling law. *Secretary of State*, 2012 IL App (4th) 111075, ¶ 55. As

the sole witness at the hearing, Whittaker testified as to the role of the senior procurement specialist during the procurement process and identified a number of internal documents discussing that process. This evidence and testimony included the job description of the role, which included a list of "essential responsibilities." Whittaker further expanded on this job description by explaining the senior procurement specialist's role in both the competitive bidding process, as well as the evaluative RFP and RFQ processes. With respect to the competitive bidding process, Whittaker specifically testified that there was an exercise of judgment involved in determining whether a bidder was a responsible bidder, which included the consideration of 20 to 30 factors.

¶ 39       The exhibits admitted into evidence also provide insight as to some of these factors. For instance, the "department of service tool kit" contains a glossary of useful terms, in which it provides that "[r]esponsibility includes such considerations as financial capacity, past performance, experience, adequacy of equipment, and the ability to perform the contract within the time frame required." The department's "procurement fundamentals" brochure contains a similar definition, providing that "[r]esponsibility includes such considerations as financial capacity, past performance, experience, adequacy of equipment, and the ability to perform the contract within the time frame required by the City."

¶ 40       Additionally, the Purchasing Act and Municipal Code both specify some of the factors that are considered in determining whether a bidder is a responsible bidder. We note that the relevant provisions of the Purchasing Act and the Municipal Code were also set forth in the exhibits admitted into evidence, and the parties do not dispute that these laws govern the department. The Purchasing Act sets forth factors such as past records of transactions with the bidder, experience, adequacy of equipment, ability to complete performance within a

specified time limit, and "other pertinent considerations" that may be considered. 65 ILCS 5/8-10-11 (West 2014). Additionally, the Purchasing Act makes clear that a bid may be rejected if the bidder is not considered responsible "or the character or quality of the services, supplies, materials, equipment or labor does not conform to requirements or if the public interest may otherwise be served thereby." 65 ILCS 5/8-10-12 (West 2014). The Municipal Code includes additional considerations, such as bid incentives and bid preferences for certain types of bidders (see, *e.g.*, Chicago Municipal Code § 2-92-405 (added Apr. 15, 2015), § 2-92-407 (added June 27, 2018), § 2-92-410 (amended Apr. 15, 2015), § 2-92-940 (added June 28, 2017)), as well as contract requirements for minority-owned and women-owned businesses (see Chicago Municipal Code § 2-92-430 (amended July 19, 2000)) and City and project-area residents (see Chicago Municipal Code § 2-92-330 (amended Apr. 10, 2013)). All of these factors set forth in the department's brochures, the Purchasing Act, and the Municipal Code support Whittaker's testimony that a senior procurement specialist considers numerous factors in determining whether a bidder is responsible.

¶ 41        The union argues that there was no evidence proving that the senior procurement specialists exercised significant discretion because there was no evidence as to how they weighed these factors. However, in the union's cross-examination of Whittaker, the only witness in this case, the union did not bring out any evidence that would show that the senior procurement specialists did not exercise significant discretion in determining whether a bidder was a responsible bidder after Whittaker specifically testified that there was an exercise of judgment involving whether a bidder was a responsible bidder or not. Whittaker testified that there were 20 to 30 factors that the senior procurement specialist used in making this determination. The union failed to present any witnesses or provide any evidence that

these factors were not used to make the determination that a bidder was or was not responsible.

¶ 42 In addition, the union points to no authority establishing that the manner of weighing these factors is necessary in the determination of whether the employees are managerial. While the City was required to present specific evidence as to the employee's duties, it did so in this case. Whittaker testified as to the procurement process step-by-step, from the time that the initial requisition request is entered into the computer system until the time that the procurement process is completed, and identified the senior procurement specialist's role in each step of that process. The union presented no evidence to controvert Whittaker's testimony in any respect. We cannot find that the Board's decision was clearly erroneous simply because Whittaker was not asked to enumerate each of the 20 to 30 factors and explain what weight was afforded to each of those factors, even assuming that there is such a formula that could be applied to every situation. The union relies on a Board decision in which the state panel of the Board affirmed an ALJ's finding that certain employees were not managerial because the county had not provided any evidence explaining how the employees used discretion in applying relevant regulations. *American Federation of State County & Municipal Employees, Council 31*, 34 PERI ¶ 91 (ILRB State Panel 2017). However, the Board made clear in that case that the issue was with the *quality* of the evidence provided, as opposed to the *type* of evidence presented. *American Federation of State County & Municipal Employees, Council 31*, 34 PERI ¶ 91 (ILRB State Panel 2017). In the case at bar, as noted, Whittaker testified as to the step-by-step detail of the procurement process, and identified the senior procurement specialist's role in that process. Thus, we cannot find that

the Board's finding that senior procurement specialists were engaged in executive and management functions was clearly erroneous.

¶ 43    We similarly find unpersuasive the union's suggestion that the ALJ "bridged [the] gap in the record" by citing to the general proposition that a public body exercises a great deal of discretion in determining the lowest responsible bidder. This statement by the ALJ is amply supported by the law—our supreme court has made clear that "a public body exercises a great deal of discretion in determining the lowest responsible bidder." *Court Street Steak House, Inc. v. County of Tazewell*, 163 Ill. 2d 159, 165 (1994). The fact that the ALJ noted that the department's determination of the lowest responsible bidder involves the exercise of discretion is thus in no way improper. Contrary to the union's contention, there is absolutely no evidence that the ALJ used this case law in order to "bridge[ ] [any] gap in the record." Instead, the ALJ found that "[h]ere, the Department exercises its discretionary power granted under the laws through its [senior procurement specialist] employees who are tasked with administering the procurement process." Thus, we cannot find that the ALJ's citation to case law rendered the Board's decision clearly erroneous.

¶ 44    With respect to the second prong of the management test, the Board adopted the ALJ's recommendation and found that the senior procurement specialists were charged with the responsibility of directing the effectuation of management policies and practices. "The second part of the statutory test emphasizes that a managerial employee's authority 'extends beyond the realm of theorizing and into the realm of practice.' " *American Federation of State, County & Municipal Employees, Council 31*, 2018 IL App (1st) 140656, ¶ 19 (quoting *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 774 (2010)). In other words, " '[a]

managerial employee not only has the authority to make policy but also bears the responsibility of making that policy happen.' " *American Federation of State, County & Municipal Employees, Council 31*, 2018 IL App (1st) 140656, ¶ 19 (quoting *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 774-75). However, " ' "the relevant consideration is effective recommendation or control rather than final authority" over employer policy.' " *American Federation of State, County & Municipal Employees (AFSCME), Council 31 v. Illinois Labor Relations Board, State Panel*, 2014 IL App (1st) 123426, ¶ 40 (quoting *Chief Judge of the Sixteenth Judicial Circuit*, 178 Ill. 2d at 339-40, quoting *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672, 683 n.17 (1980)). Accordingly, an advisory employee who makes effective recommendations can be managerial. *American Federation of State, County & Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 123426, ¶ 40. Recommendations are "effective" if "they are almost always implemented or followed." *American Federation of State, County & Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 123426, ¶ 40.

¶ 45    In the case at bar, the union's only argument as to the second prong is that the senior procurement specialists did not direct the effectuation of the department's policies in a managerial fashion because they did not exercise sufficient discretion when implementing those policies. However, this is merely a rehashing of the union's arguments concerning the first prong, which we have already found unpersuasive. Additionally, the uncontroverted testimony of Whittaker established that the senior procurement specialist's recommendation as to the lowest responsible bidder was accepted "[p]retty much *** all the time." Since the employees' recommendations are effective, we cannot find the Board's decision that the senior procurement specialists were managerial employees to be clearly erroneous.

¶ 46                                          CONCLUSION

¶ 47        For the reasons set forth above, the Board's determination that senior procurement specialists are managerial employees was not clearly erroneous.

¶ 48        Affirmed.